IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| CITIZENS FOR PENNSYLVANIA'S FUTURE, | ) ) ) | CIVIL ACTION |
| Plaintiff | ) ) | No. _____ |
| v. | ) ) ) | FILED ELECTRONICALLY |
| ULTRA RESOURCES, INC., | ) ) | |
| Defendant. | ) ) | |

## COMPLAINT

NOW COMES Plaintiff Citizens for Pennsylvania's Future ("PennFuture"), by and through its undersigned attorneys, and alleges:

1.     This is a civil action brought by PennFuture against Defendant Ultra Resources, Inc. ("Ultra") pursuant to Section 304(a)(3) of the Clean Air Act (the "CAA") (42 U.S.C. § 7604(a)(3)), seeking declaratory relief, injunctive relief, the imposition of civil penalties, and the award of costs, including attorneys fees and expert witness fees, for violations of the CAA, Pennsylvania's State Implementation Plan (the "Pennsylvania SIP"), and Pennsylvania's New Source Review regulations, 25 Pa. Code Chapter 127, Subchapter E.

2.      Since 2008, Ultra has constructed, and thereafter operated, an extensive network of natural gas wells, pipelines, compressor stations, and associated equipment in Elk and Gaines Townships, Tioga County, Pennsylvania, and Abbott, Pike, and West Branch Townships, Potter County, Pennsylvania, all of which are connected by pipeline to a Metering and Regulation Station, also constructed and operated by Ultra, where the gas produced at Ultra's wells is adjusted for pressure, measured, and delivered to an interstate pipeline operated by Dominion Transmission, Inc.  Ultra refers to these gas production facilities collectively as the "Marshlands Play."

3.      Ultra has constructed and operated the Marshlands Play without obtaining all necessary permits (including specifically, a permit required by Pennsylvania's New Source Review ("NSR") regulations, which are codified at 25 Pa. Code §§ 127.201 – 127.218), and without achieving the lowest achievable emissions rate ("LAER") as required by those regulations, the CAA, and the Pennsylvania SIP to control emissions of nitrogen oxides ("NOx").  Ultra has also failed to offset the Marshlands Play's potential to emit NOx with emissions reductions credits ("ERCs") and has not performed an alternatives analysis for the Marshlands Play, also as required by the CAA, the Pennsylvania SIP, and the NSR regulations.

4.      As a result of Ultra's unlawful construction and operation of the Marshlands Play, large amounts of NOx and related pollution have been, and continue to be, released into the atmosphere.  In the atmosphere, NOx combines with other elements to form fine particulate matter ("PM2.5") and ozone, both of which cause harm to human health and to the environment.

## PARTIES

5.     Plaintiff PennFuture is a statewide, public interest, membership organization with its principal offices in Harrisburg, and other offices in Pittsburgh, Philadelphia, and Wilkes-Barre.  PennFuture's purposes include advocating and litigating on behalf of the environment and public health, air quality, and water quality in Pennsylvania.

6.     PennFuture has invested significant organizational resources to help reduce ozone and smog pollution in Tioga and Potter Counties and other parts of Pennsylvania.  In 2002, PennFuture filed a lawsuit against the Secretary of the Pennsylvania Department of Environmental Protection ("DEP") and the Secretary of the Pennsylvania Department of Transportation to require compliance with automobile inspection procedures intended to reduce ozone and smog pollution and mandated by the United States Environmental Protection Agency ("USEPA").  The 2003 settlement that resolved that lawsuit required changes to Pennsylvania's automobile inspection program.  Accordingly, since December 2003, passenger cars and light trucks registered in Tioga and Potter Counties (and forty other counties in Pennsylvania) have been required to pass a visual anti-tampering check to ensure that the emissions controls devices installed in them by manufacturers are present and are connected properly.  More stringent inspections procedures are required in the more densely-populated areas of Pennsylvania.

7.     The vehicle emissions inspection program required under the 2003 settlement is one of the "Control Measures" listed in Section 3 ("Demonstration of Permanent and Enforceable Improvement") of DEP's September 2006 "Request for Redesignation as Attainment, Tioga County Eight-Hour Ozone Nonattainment Area" (Request for Redesignation), and is one of the "Permanent and Enforceable Control Measures for Maintenance" listed in Section 2 of DEP's September 2006 Maintenance Plan associated with the Request for Redesignation.  USEPA granted

DEP's Request for Redesignation and approved the associated Maintenance Plan on July 6, 2007.  Redesignation of the Tioga County Ozone Nonattainment Area to Attainment, 72 Fed. Reg. 36892 (July 6, 2007).

8.      The vehicle emissions inspection program required under the 2003 settlement has contributed to substantial reductions of ozone and smog pollution in Tioga and Potter Counties and other parts of Pennsylvania.  DEP's September 2006 Request for Redesignation lists the 2003 eight-hour ozone "design value" for Tioga County (the three-year average of the fourth highest eight-hour concentration at DEP's Tioga County ozone monitor during 2001-2003) as 86 ppb. In a March 2009 submission to EPA entitled "Designation Recommendations for the 2008 Eight-Hour Ozone National Ambient Air Quality Standard," DEP lists the eight-hour ozone design value for Tioga County as 73 ppb, based on 2006-2008 monitoring data.  In a document titled "O3 Air Quality Data Update 2007-2009 Design Values," EPA lists the eight-hour ozone design value for Tioga County as 70 ppb, based on monitoring data for 2007-2009.

9.      Ultra's unpermitted and unlawful construction and operation of the Marshlands Play undermines the gains in air quality in Tioga and Potter Counties that were secured by the 2003 settlement of PennFuture's lawsuit and thereby diminishes the value of PennFuture's investment of its organizational resources in reducing ozone and smog pollution in Tioga County, Potter County, and elsewhere in Pennsylvania.

10.     The claims presented and relief sought in this action, and the interests of its members that PennFuture seeks to protect in this action, are germane to the purposes and goals of PennFuture.

11.     PennFuture members live, work, recreate, and conduct other activities in the parts of Tioga and Potter Counties, and other areas in Pennsylvania, that are affected by the violations alleged in this Complaint.

12.    PennFuture members have suffered, and will continue to suffer, actual and threatened injury due to the violations of the CAA, the Pennsylvania SIP, and the Pennsylvania NSR regulations described in this Complaint. Specifically, as a result of the violations described in this Complaint, PennFuture members are exposed to, and threatened with exposure to, increased levels of NOx, ozone, and PM2.5 in the air they breathe. As a result, PennFuture members are at increased risk of and may suffer from a variety of adverse health effects that are attributable to NOx, ozone, and PM2.5 pollution.

13.    PennFuture member Robert Ross lives in Wellsboro, Pennsylvania, from May through October. The prevailing winds in Tioga County are from the southwest in the summer months and from west for the rest of the year; accordingly, Wellsboro is downwind from Ultra's Marshlands Play and Dr. Ross believes that the air that he breathes may be polluted by emissions from Ultra's activities and facilities in the Marshlands Play. Dr. Ross visits areas within and near the Marshlands Play several times a year to watch birds and enjoy nature. Dr. Ross has witnessed the rapid expansion of natural gas production facilities in those areas, and is troubled by the impact it is having on the environment, both aquatic and terrestrial. Disturbance and fragmentation of the forest due to gas well development in the area has resulted in the loss of many species from those formerly natural habitats. Dr. Ross is also concerned that air emissions from Ultra's wells, compressor stations, and other facilities in the Marshlands Play may not be properly controlled and as a result could adversely impact his health and the environment. His concerns about air emissions from Ultra's facilities also diminish his enjoyment of visits to areas within and near the Marshlands Play. Consequently, Dr. Ross makes fewer visits to those areas than he used to and than he otherwise would.

14.     PennFuture member John Kesich lives in Rutland Township, Tioga County, about forty miles to the north and east of the Marshlands Play.  Mr. Kesich retired to Tioga County after having lived for many years in New York City in order to be able to take advantage of being close to nature and so that he can spend as much time as possible outside.  The prevailing winds in Tioga County are from the southwest in the summer months and from west for the rest of the year; because Rutland Township is downwind from the Marshlands Play, Mr. Kesich believes that the air that he breathes is polluted by emissions from Ultra's activities and facilities in the Marshlands Play.  Mr. Kesich has read reports about the air pollution created by shale gas production and the increased incidence of asthma and other lung ailments in areas where shale gas extraction takes place, especially the Barnett Shale near Forth Worth, Texas.  Mr. Kesich goes for a one-mile walk outside before breakfast every day and spends two to four hours a day outside.  He is concerned that the already large, and increasing, number of gas wells, compressor stations, and related facilities in the Marshlands Play and surrounding areas, if not properly regulated, will emit pollutants into the air that will adversely affect his health and his ability to spend time outside.

15.     Defendant Ultra Resources, Inc., is a corporation organized under the laws of the state of Wyoming, and is a wholly-owned subsidary of Ultra Petroleum Corporation.  Ultra has its main offices at 304 Inverness Way South, Englewood, CO  80112, and also maintains an office in this District at 5 East Avenue, Wellsboro, PA  16901.

16.     Ultra is a corporate entity and, as such, is a "person" within the meaning of CAA Section 302(e).  42 U.S.C. § 7602(e).

## JURISDICTION AND VENUE

17.     This Court has jurisdiction over the subject matter of this action pursuant to CAA Section 304(a) (42 U.S.C. § 7413(b)), 28 U.S.C. § 1331, and 28 U.S.C. § 1367.

18.     Venue is proper in this District pursuant to CAA Section 304(c)(1) (42 U.S.C. § 7604(c)(1)), and 28 U.S.C. §§ 1391(b), (c), and 1395(a), because the sources of air pollution that are the subject of PennFuture's claims are located in this District.

## STATUTORY AND REGULATORY BACKGROUND

19.     The Clean Air Act is designed to protect and enhance the quality of the nation's air, so as to promote the public health and welfare and the productive capacity of its population.  *See* 42 U.S.C. § 7401(b)(1).

20.     Section 109 of the Act (42 U.S.C. § 7409), requires the Administrator of the United States Environmental Protection Agency ("USEPA") to promulgate regulations establishing primary and secondary national ambient air quality standards ("NAAQS") for those air pollutants ("criteria pollutants") for which air quality criteria have been issued pursuant to CAA Section 108 (42 U.S.C. § 7408). The primary NAAQS are intended to be adequate to protect public health with an adequate margin of safety, and the secondary NAAQS are intended to be adequate to protect public welfare from any known or anticipated adverse effects associated with the presence of the air pollutant in the ambient air.

21.     The NAAQS promulgated by USEPA pursuant to CAA Section 108 are set forth in 40 C.F.R. Part 50.  USEPA has established NAAQS for NOx.  40 C.F.R. § 50.11.

22.     NOx is regulated as a precursor to PM2.5 and ozone, which have demonstrated adverse impacts on human health and the environment.  *See Primary National Ambient Air Quality Standards for Nitrogen Dioxide*, 75 Fed. Reg. 6474, 6479-82 (Feb. 9, 2010) (discussing health impacts from long- and short-term exposure to elevated levels of NOx).

23.     Under CAA Section 107(d) (42 U.S.C. § 7407(d)), each state is required to designate areas within its boundaries where the air quality is better or worse than the NAAQS for each criteria pollutant or where the air quality cannot be classified due to insufficient data.  An area that meets the NAAQS for a particular pollutant must be classified as an "attainment" area.  An area that does not meet the NAAQS must be classified as a "nonattainment" area.  An area that cannot be classified due to insufficient data must be classified as "unclassifiable."

24.     CAA Section 172(c) (42 U.S.C. § 7502(c)) and CAA Section 173 (42 U.S.C. § 7503) require that each state must adopt and submit to USEPA for approval a state implementation plan, which includes (among other things), a permitting program for the construction and operation of new or modified major stationary sources in nonattainment areas.  Such programs are commonly referred to as "New Source Review" or "NSR" programs.  The Pennsylvania SIP is codified at 40 C.F.R. § 52.2020.

25.     CAA Section 184 (42 U.S.C. § 7511c) establishes an ozone transport region which includes the state of Pennsylvania.  Consequently, stationary sources in areas of Pennsylvania that are classified as marginal or attainment for ozone (including Tioga and Potter Counties) are nevertheless subject to NSR permitting requirements that would otherwise be applicable to moderate nonattainment areas for ozone.  *See* 40 C.F.R. § 51.905(e)(4)(iv).

26.     Pennsylvania's NSR program is set forth in the regulations codified at 25 Pa. Code §§ 127.201 – 127.218, which are incorporated into the Pennsylvania SIP.  *See* 40 C.F.R. § 52.2020(c).

27.     Pennsylvania's NSR program is administered by the Pennsylvania Department of Environmental Protection ("DEP").

28.     Pennsylvania's NSR program must use definitions that are at least as stringent as those set forth in 40 C.F.R. § 51.165.  The definitions used in Pennsylvania's NSR permitting regulations are codified at 25 Pa. Code § 127.1 and are incorporated into Pennsylvania's SIP.  *See* 40 C.F.R. § 52.2020(c).

29.     For the purposes of Pennsylvania's NSR permitting program, "source" means an "air contamination source."  25 Pa. Code § 127.1.  An "air contamination source" means "[a]ny place, facility or equipment, stationary or mobile, at, from or by reason of which there is emitted into the outdoor atmosphere any air contaminant."  *Id.*  A "facility" means "[a]n air contamination source or a combination of air contamination sources located on one or more contiguous or adjacent properties and which is owned and operated by the same person under common control."  *Id.*; *cf.* 40 C.F.R. § 51.165(a)(1)(ii) (defining "building, structure, facility or installation" to mean "all of the pollutant-emitting activities which belong to the same industrial grouping, are located on one or more contiguous or adjacent properties, and are under the common control of the same person …").

30.     For purposes of determining whether facilities are subject to NSR permitting requirements, USEPA has rejected the notion "contiguous or adjacent" activities are limited to those that occur in close physical proximity to one another. Instead, USEPA has determined that even activities that occur several miles apart may be "contiguous or adjacent" if they are operationally interdependent.  *See*

Letter from Kathleen Henry, USEPA, to John Slade, DEP (Jan. 15, 1999) (attached hereto as Exhibit 1)

31.     A source in Pennsylvania with potential to emit 100 TPY or more of NOx may not be constructed or operate without a permit issued by DEP pursuant to Pennsylvania's NSR permitting program.  25 Pa. Code § 127.201(c).  Such a permit may not be issued unless the applicant demonstrates that certain requirements are met, including at least that:  (i) the facility achieves LAER, *see* 25 Pa. Code § 127.205(1); (ii) all other facilities in Pennsylvania with the same owner or under common control that are subject to NSR permitting requirements are in compliance with applicable emissions limitations and standards for air pollution, *see* 25 Pa. Code § 127.205(2); (iii) the new source's potential to emit be offset with emissions reductions credits in accordance with the NSR rules, *see* 25 Pa. Code § 127.205(4); and (iv) an alternatives analysis has been conducted for the facility, which "demonstrates that the benefits of the proposed facility significantly outweigh the environmental and social costs imposed within [Pennsylvania] as a result of [the facility's] location, construction or modification," *see* 25 Pa. Code § 127.205(5).

32.     In pertinent part, LAER means:  "[t]he rate of emissions based on the following, whichever is more stringent:  (A) The most stringent emission limitation which is contained in the implementation plan of a state for the class or category of source unless the owner or operator of the proposed source demonstrates that the limitations are not achievable.  (B) The most stringent emission limitation which is achieved in practice by the class or category of source."  25 Pa. Code § 121.1.

## FACTUAL BACKGROUND

33.     Ultra is developing a network consisting of at least thirty-four natural gas well pads, an extensive network of pipelines, and seven compressor stations, as

well as a single metering and regulation station in a 558-square mile area in Tioga and Potter Counties, Pennsylvania.  Ultra refers to its facilities in this area as the "Marshlands Play."

34.     Ultra's facilities in the Marshlands Play share a common workforce and management.

35.     Ultra has obtained, or plans to obtain, permits to drill and operate at least six natural gas wells at each well pad in the Marshlands Play.

36.     Ultra has installed equipment that emits air pollutants, including NOx, at each of its well pads in the Marshlands Play.  Such equipment is used to dehydrate the gas produced by Ultra's wells before the gas is transported by pipeline, and for each well pad includes one or more gas line heaters, one or more glycol reboilers, one or more still vent combustors, and one or more dehydrator units.  Depending on the specific dehydration equipment installed at a particular well pad, the emissions from the equipment at each well pad range between approximately 1.68 and 3.07 TPY of NOx.

37.     Ultra's compressor stations also emit NOx.  The amount of the emissions from Ultra's compressor stations in the Marshlands Play depends primarily on the type and rating of the compressor engines installed at the stations, and also on the emissions controls (if any) installed at the compressor stations.

Ultra's Ken Ton Compressor Station and Connected Gas Wells

38.     Ultra's Ken Ton Compressor Station is operated pursuant to General Plan Approval and General Operating Permit GP5-53-110.  The permit's emissions limitation for NOx emissions from the compressor engine at Ultra's Ken Ton Compressor Station is 12.07 TPY.

39.     Ultra also operates three dehydrator units, three gas line heaters, three glycol reboilers, and three still vent combustors in connection with its gas wells

11

located on the Ken Ton 902 Well Pad with the Ken Ton Compressor Station
pursuant to General Plan Approval and General Operating Permit GP5-53-110.
The permit's emissions limitation for NOx emissions from such equipment is 2.16
TPY.

40.     Ultra's Ken Ton 902 well pad, Martin 806 well pad, Ritter 828 well
pad, Granger 850 well pad, Granger 853 well pad, and Sylvan Glen 913 well pad
are all connected by pipeline to Ultra's Ken Ton Compressor Station.

41.     Ultra sited its Ken Ton Compressor Station in order to integrate the
compressor station's operations with the operations of the gas wells on Ultra's Ken
Ton 902 well pad, Martin 806 well pad, Ritter 828 well pad, Granger 850 well pad,
Granger 853 well pad, and Sylvan Glen 913 well pad.

42.     If Ultra's Ken Ton Compressor Station were shut down, gas from the
wells connected to the compressor station would cease to flow into the pipelines
connecting those wells and the compressor station.

43.     Gas produced by Ultra's wells on Ultra's Ken Ton 902 well pad,
Martin 806 well pad, Ritter 828 well pad, Granger 850 well pad, Granger 853 well
pad, and Sylvan Glen 913 well pad is compressed at Ultra's Ken Ton Compressor
Station and then transported to Ultra's Metering and Regulation Station by Ultra's
Pipelines 108, 107W, 111, 134, and 107E.

44.     Ultra's wells on Ultra's Ken Ton 902 well pad, Martin 806 well pad,
Ritter 828 well pad, Granger 850 well pad, Granger 853 well pad, and Sylvan Glen
913 well pad, Ultra's Ken Ton Compressor Station, and Ultra's Metering and
Regulation Station are operationally interdependent.

Ultra's Button Compressor Station and Connected Gas Wells

45.     Ultra's Button Compressor Station is operated pursuant to General
Plan Approval and General Operating Permit GP5-53-105A.  The permit's

emissions limitation for NOx emissions from the compressor engines at Ultra's Button Compressor Station is 38.82 TPY.

46.     Ultra also operates one dehydrator unit, three gas line heaters, one glycol reboiler, and one still vent combustor in connection with its gas wells located on the Button 902 Well Pad with the Button Compressor Station pursuant to General Plan Approval and General Operating Permit GP5-53-105A.  The permit's emissions limitation for NOx emissions from such equipment is 3.07 TPY NOx.

47.     Ultra's Button 901 well pad, Mitchell 903 well pad, Coon Hollow 904 well pad, Fowler 905 well pad, Paul 906 well pad, Beecher 910 well pad, Patel 914 well pad, and Paxson 916 well pad are all connected by pipeline to Ultra's Button Compressor Station.

48.     Ultra sited its Button Compressor Station in order to integrate the compressor station's operations with the operations of the gas wells on Ultra's Button 901 well pad, Mitchell 903 well pad, Coon Hollow 904 well pad, Fowler 905 well pad, Paul 906 well pad, Beecher 910 well pad, Patel 914 well pad, and Paxson 916 well pad.

49.     If Ultra's Button Compressor Station were shut down, gas from the wells connected to the compressor station would cease to flow into the pipelines connecting those wells and the compressor station.

50.     Gas produced by Ultra's wells on Ultra's Button 901 well pad, Mitchell 903 well pad, Coon Hollow 904 well pad, Fowler 905 well pad, Paul 906 well pad, Beecher 910 well pad, Patel 914 well pad, and Paxson 916 well pad is compressed at Ultra's Button Compressor Station and then transported to Ultra's Metering and Regulation Station by Ultra's Pipelines 107W, 111, 134, and 107E.

51.     Ultra's wells on Ultra's Button 901 well pad, Mitchell 903 well pad, Coon Hollow 904 well pad, Fowler 905 well pad, Paul 906 well pad, Beecher 910

well pad, Patel 914 well pad, and Paxson 916, Ultra's Button Compressor Station, and Ultra's Metering and Regulation Station are operationally interdependent.

Ultra's Thomas Compressor Station and Connected Gas Wells

52.    Ultra's Thomas Compressor Station is operated pursuant to General Plan Approval and General Operating Permit GP5-59-214.  The permit's emissions limitations for NOx emissions from the compressor engine at Ultra's Thomas Compressor Station is19.41 TPY.

53.    Ultra also operates one dehydrator unit, three gas line heaters, one glycol reboiler, and one still vent combustor in connection with its gas wells located on the Thomas 808 Well Pad with the Thomas Compressor Station pursuant to General Plan Approval and General Operating Permit GP5-59-214. The permit's emissions limitation for NOX emissions from such equipment is 3.07 TPY NOx.

54.    Ultra's wells at Ultra's Thomas 808 well pad are connected by pipeline to Ultra's Thomas Compressor Station.

55.    Ultra sited its Thomas Compressor Station in order to integrate the compressor station's operations with the operations of the gas wells on Ultra's Thomas 808 well pad.

56.    If Ultra's Thomas Compressor Station were shut down, gas from the wells connected to the compressor station would cease to flow into the pipelines connecting those wells and the compressor station.

57.    Gas produced by Ultra's wells at Ultra's Thomas 808 well pad is compressed at Ultra's Thomas Compressor Station and then transported to Ultra's Metering and Regulation Station by Pipelines 134 and 107E.

58.     Ultra's wells on Ultra's Thomas 808 well pad, Ultra's Thomas Compressor Station, and Ultra's Metering and Regulation Station are operationally interdependent.

Ultra's Pierson Compressor Station and Connected Gas Wells

59.     Ultra's Pierson Compressor Station is a source of air operated pursuant to General Plan Approval and General Operating Permit GP5-59-194. The permit's emissions limitation for NOx emissions from the compressor engine at Ultra's Pierson Compressor Station is 19.41 TPY.

60.     Ultra also operates one dehydrator unit, three gas line heaters, one glycol reboiler, and one still vent combustor in connection with its gas wells located on the Pierson 810 Well Pad with the Pierson Compressor Station pursuant to General Plan Approval and General Operating Permit GP5-59-194.  The permit's emissions limitation for NOx emissions from such equipment is 3.07 TPY.

61.     Ultra's wells at Ultra's Pierson 810 well pad and Fox 813 well pad are connected by pipeline to Ultra's Pierson Compressor Station.

62.     Ultra sited its Pierson Compressor Station in order to integrate the compressor station's operations with the operations of the gas wells on Ultra's Pierson 810 well pad and Fox 813 well pad.

63.     If Ultra's Pierson Compressor Station were shut down, gas from the wells connected to the compressor station would cease to flow into the pipelines connecting those wells and the compressor station.

64.     Gas produced by Ultra's wells at Ultra's Pierson 810 and Fox 813 well pads is compressed at Ultra's Pierson Compressor Station and then transported to Ultra's Metering and Regulation Station by Ultra's Pipelines 134 and 107E.

15

65.    Ultra's wells on Ultra's Pierson 810 and Fox 813 well pads, Ultra's Pierson Compressor Station, and Ultra's Metering and Regulation Station are operationally interdependent.

Ultra's Kjelgaard Compressor Station and Connected Gas Wells

66.    Ultra's Kjelgaard Compressor Station is operated pursuant to General Plan Approval and General Operating Permit GP5-59-193A.  The permit's emissions limitation for NOx emissions from the compressor engines at Ultra's Kjelgaard Compressor Station is 6.37 TPY.

67.    Ultra also operates four dehydrator units, four gas line heaters, four glycol reboilers, and four still vent combustors in connection with its gas wells located on the Kjelgaard 802 Well Pad with the Kjelgaard Compressor Station pursuant to General Plan Approval and General Operating Permit GP5-59-193A. The permit's emissions limitation for NOx emissions from such equipment is 2.41 TPY.

68.    Ultra's Kjelgaard 802 well pad and Bergey 812 well pad are connected by pipeline to Ultra's Kjelgaard Compressor Station.

69.    Ultra sited its Kjelgaard Compressor Station in order to integrate the compressor station's operations with the operations of the gas wells on Ultra's Kjelgaard 802 well pad and Bergey 812 well pad.

70.    If Ultra's Kjelgaard Compressor Station were shut down, gas from the wells connected to the compressor station would cease to flow into the pipelines connecting those wells and the compressor station.

71.    Gas produced by Ultra's wells on Ultra's Kjelgaard 802 and Bergey 812 well pads is compressed at Ultra's Kjelgaard Compressor Station and then transported to Ultra's Metering and Regulation Station by Ultra's Pipeline 103.

72.     Ultra's wells on Ultra's Kjelgaard 802 and Bergey 812 well pads, Ultra's Kjelgaard Compressor Station, and Ultra's Metering and Regulation Station are operationally interdependent.


Ultra's Lick Run Compressor Station and Connected Gas Wells

73.     UItra's Lick Run Compressor Station is operated pursuant to General Plan Approval and General Operating Permit GP5-59-198A.  The permit's emissions limitation for NOx emissions from the compressor engine at Ultra's Lick Run Compressor Station is 22.47 TPY.

74.     Ultra also operates one dehydrator unit, three gas line heaters, one glycol reboiler, and one glycol still vent combustor in connection with its gas wells located on the Lick Run 803 Well Pad with the Lick Run Compressor Station pursuant to General Plan Approval and General Operating Permit GP5-59-198A. The permit's emissions limitation for NOx emissions from such equipment is 3.06 TPY.

75.     Ultra's Lick Run 803 well pad, Hillside 804 well pad, Simonetti 817 well pad, and Miskis 831 well pad are connected by pipeline to Ultra's Lick Run Compressor Station.

76.     Ultra sited its Lick Run Compressor Station in order to integrate the compressor station's operations with the operations of the gas wells on Ultra's Lick Run 803 well pad, Hillside 804 well pad, Simonetti 817 well pad, and Miskis 831 well pad.

77.     If Ultra's Lick Run Compressor Station were shut down, gas from the wells connected to the compressor station would cease to flow into the pipelines connecting those wells and the compressor station.

78.     Gas produced by Ultra's wells on Ultra's Lick Run 803 well pad, Hillside 804 well pad, Simonetti 817 well pad, and Miskis 831 well pad is compressed at Ultra's Lick Run Compressor Station and then transported to Ultra's Metering and Regulation Station by Ultra's Pipeline 104 and Pipeline 103.

79.     Ultra's wells on Ultra's Lick Run 803 well pad, Hillside 804 well pad, Simonetti 817 well pad, and Miskis 831 well pads, Ultra's Lick Run Compressor Station, and Ultra's Metering and Regulation Station are operationally interdependent.

Ultra's State 815 Compressor Station and Connected Gas Wells

80.     Ultra's State 815 Compressor Station is operated pursuant to General Plan Approval and General Operating Permit GP5-59-212A.  The permit's emissions limitation for NOx emissions from the compressor engine at Ultra's State 815 Compressor Station is 7.09 TPY.

81.     Ultra also operates one dehydration unit, one gas line heater, one glycol reboiler, and one glycol still vent combustor in connection with its gas wells located on the State 815 Well Pad with Ultra's State 815 Compressor Station pursuant to General Plan Approval and General Operating Permit GP5-59-212A. The permit's emissions limitation for NOx emissions from such equipment is 1.68 TPY.

82.     Ultra's State 815 well pad, State 814 well pad, State 816 well pad, State 818 well pad, State 819 well pad, State 820 well pad, State 822 well pad, State 824 well pad, State 825 well pad, State 826 well pad, State 827 well pad, State 841 well pad, State 842 well pad, and State 843 well pad are all connected by pipeline to Ultra's State 815 Compressor Station.

83.     Ultra sited its State 815 Compressor Station in order to integrate the compressor station's operations with the operations of the gas wells on Ultra's

State 815 well pad, State 814 well pad, State 816 well pad, State 818 well pad, State 819 well pad, State 820 well pad, State 822 well pad, State 824 well pad, State 825 well pad, State 826 well pad, State 827 well pad, State 841 well pad, State 842 well pad, and State 843 well pad.

84.     If Ultra's State 815 Compressor Station were shut down, gas from the wells connected to the compressor station would cease to flow into the pipelines connecting those wells and the compressor station.

85.     Ultra's wells on Ultra's State 815 well pad, State 814 well pad, State 816 well pad, State 818 well pad, State 819 well pad, State 820 well pad, State 822 well pad, State 824 well pad, State 825 well pad, State 826 well pad, State 827 well pad, State 841 well pad, State 842 well pad, and State 843 well pad is compressed at Ultra's State 815 Compressor Station and then transported to Ultra's Metering and Regulation Station by Ultra's Pipeline 114.

86.     Ultra's wells on Ultra's State 815 well pad, State 814 well pad, State 816 well pad, State 818 well pad, State 819 well pad, State 820 well pad, State 822 well pad, State 824 well pad, State 825 well pad, State 826 well pad, State 827 well pad, State 841 well pad, State 842 well pad, and State 843 well pads, Ultra's State 815 Compressor Station, and Ultra's Metering and Regulation Station are operationally interdependent.

Ultra's Metering and Regulation Station

87.     All gas produced by Ultra's well in the Marshlands Play and compressed at Ultra's compressor stations in the Marshlands Play is piped to Ultra's Metering and Regulation Station, which adjusts the pressure and amount of gas that enters Dominion Transmission, Inc.'s LN50 interstate natural gas pipeline (the "Dominion Pipeline").

88.     One well pad in the Marshlands Play, Ultra's Stewart 805 well pad, is connected directly to Ultra's Metering and Regulation Station by Ultra's Pipelines 133 and 107E.

89.     All of the natural gas produced in the Marshlands Play is adjusted to the proper pressure and metered for delivery to the Dominion Pipeline at Ultra's Metering and Regulation Station.  No gas produced by an operator other than Ultra is pressure-adjusted and metered at Ultra's Metering and Regulation Station.

90.     If Ultra's Metering and Regulation Station were shut down, gas produced by Ultra's wells in the Marshlands Play could not enter the Dominion Pipeline.  Accordingly, the operations of all of Ultra's gas wells and compressor stations in the Marshlands Play are dependent on the Metering and Regulation Station.

91.     Because the operations of Ultra's Metering and Regulation Station; its Ken Ton, Button, Thomas, Pierson, Lick Run, Kjelgaard, and State 815 Compressor Stations, and all of Ultra's gas wells that are connected by pipeline to those compressor stations are interdependent, those installations are "contiguous or adjacent properties," and thus in the aggregate constitute both a "facility" and an "air contamination source" within the meaning of 25 Pa. Code § 121.1, and a "source" within the meaning of 25 Pa. Code § 127.1.

92.     The potential emissions of NOx from Ultra's gas wells and compressor stations in the Marshlands Play exceed 100 TPY.

Ultra's Failure to Obtain an NSR Permit for the Marshlands Play

93.     Ultra has applied for and/or received from the Pennsylvania Department of Environmental Protection ("DEP") a separate permit to construct and operate each compressor station in the Marshlands Play under DEP's general permitting program for sources of air pollution.  These permits include emissions

limitations for the compressor engines at each compressor station and for the equipment associated with the gas wells at each compressor station.

94.     Ultra is required, but has failed, to apply for and obtain a permit from DEP pursuant to Pennsylvania's NSR program to construct and operate the facilities in the Marshlands Play.

95.     Ultra's facilities in the Marshlands Play have emitted and continue to release into the air significant amounts of NOx, a precursor to ozone and PM2.5. Such emissions would have been avoided or minimized had Ultra installed emissions controls and implemented practices to achieve LAER as required by 25 Pa. Code § 127.205(1).  Such emissions harm public health and the environment, contributing to and creating adverse effects in downwind communities and natural areas.

96.     Ultra is required, but has failed, to offset the potential to emit of its gas wells and compressor stations in the Marshlands Play with emissions reductions credits ("ERCs") as required by 25 Pa. Code §§ 127.205(4) and 127.210.  Such ERCs would have reduced NOx, ozone, and PM2.5 levels in the air in Potter and Tioga Counties, and in other downwind areas.

97.     Ultra is required, but has failed, to perform an alternatives analysis as required by 25 Pa. Code § 127.205(5).

## FIRST CLAIM FOR RELIEF

### Violations of the Clean Air Act, Pennsylvania's SIP, and Pennsylvania's NSR Regulations

98.     Paragraphs 1 - 97 are realleged and incorporated by reference as if fully restated herein.

99.     Ultra's failure to obtain a permit to construct and operate its gas wells, compressor stations, metering and regulation station, and associated equipment in the Marshlands Play is a violation of the CAA, the Pennsylvania SIP, and Pennsylvania's NSR regulations.

WHEREFORE, PennFuture respectfully requests that this Court:

(a)     Declare that Ultra has violated and continues to be in violation of the CAA, the Pennsylvania SIP, and Pennsylvania's NSR regulations;

(b)     Enjoin Ultra from further violations of the CAA, the Pennsylvania SIP, and Pennsylvania's NSR regulations;

(c)     Order Ultra to take all necessary steps to comply with the CAA, the Pennsylvania SIP, and Pennsylvania's NSR regulations;

(d)     Order Ultra to pay civil penalties for its violations of the CAA, the Pennsylvania SIP, and Pennsylvania's NSR regulations;

(e)     Award PennFuture its costs and reasonable attorney and expert witness fees;

(f)     Retain jurisdiction over this action to ensure compliance with the Court's Orders; and

(g)     Grant such other relief as the Court deems just and proper.

Respectfully submitted,


s/  John K. Baillie
_____
John K. Baillie, Esq.
PA ID # 66903
Citizens for Pennsylvania's Future
425 Sixth Avenue, Suite 2770
Pittsburgh, PA  15219
(412) 258-6684
Fax:  (412) 258-6685
Email:  baillie@pennfuture.org

Mark Szybist, Esq.
PA ID # 94112
Citizens for Pennsylvania's Future
15 Public Square, Suite 101
Wilkes-Barre, PA  18701
(570) 208-4007
Email:  szybist@pennfuture.org

DATED:  July 21, 2011

Attorneys for Plaintiff Citizens for
Pennsylvania's Future