THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| CITIZENS FOR PENNSYLVANIA'S FUTURE, | : | |
| Plaintiff | : | |
| v. | : | 4:11-CV-1360 |
| | : | (JUDGE MARIANI) |
| ULTRA RESOURCES, INC., | : | |
| | : | |
| Defendant | : | |

## MEMORANDUM OPINION

### I. Introduction

Plaintiff Citizens for Pennsylvania's Future ("PennFuture") filed this citizen suit against

Defendant Ultra Resources, Inc. ("Ultra") for alleged violations of the Clean Air Act ("CAA"), 42

U.S.C. §§ 7401 *et seq*. PennFuture contends that Ultra built a major facility which produces

nitrogen oxide ("$NO_x$") emissions without obtaining the appropriate nonattainment New Source

Review ("NNSR") permit under the state regulations contained in 25 PA. CODE 127(E). Ultra

responds that it properly applied for and received less stringent permits (GP-5s) from the

Pennsylvania Department of Environmental Protection ("PADEP"). In issuing these GP-5s,

PADEP decided to issue a permit to each compressor station as an individual $NO_x$ emitting

facility instead of aggregating the facilities. Had PADEP aggregated the facilities, PennFuture

argues, Ultra would have needed a major source permit.

Ultra filed a motion to dismiss for lack of subject-matter jurisdiction (Doc. 9), arguing that

the proper forum for PennFuture to challenge the issuance of the GP-5 permits was before the

Pennsylvania Environmental Hearing board ("EHB"). In support of its argument, Ultra says that

if this Court were to recognize PennFuture's ability to bring this citizen suit, it would "allow citizens' groups to circumvent the established process and procedures under Pennsylvania law for challenging PADEP's permitting decisions." (Doc. 16, at 3). The motion has been fully briefed and is ripe for review.

## II. Statutory Background

Though it enacted the CAA, Congress has found "that air pollution prevention . . . and air pollution control at its source is the primary responsibility of States and local governments" 42 U.S.C. § 7401(a)(3), with assistance and guidance from the federal government. *Id.* at 7401(a)(4). That is, each state, not the Environmental Protection Agency ("EPA"), issues any and all permits sought. Thus, consistent with the aims of the CAA, each state must submit to the EPA for review and approval a state implementation plan ("SIP") "which provides for implementation, maintenance, and enforcement of . . . standard[s] in each air quality control region . . . within such State." 42 U.S.C. § 7410(a)(1). A state agency must be designated to review applications for major source construction permits under Part D,[1] and each SIP must use the "specific definitions" established in EPA regulations unless the state's definitions are "more stringent, or at least as stringent" as the federal definitions. 40 C.F.R. 51.165(a)(1).

To comply with federal standards, Pennsylvania enacted the Air Pollution Control Act ("APCA"), 35 P.S. § 4001 *et seq*. The APCA delegates authority to the Environmental Quality Board ("EQB") to develop rules and regulations to implement the provisions of the CAA,[2] and

---

[1] *See* 42 U.S.C. §§ 7410(a), 7502(b) & (c), 7503; 40 C.F.R. § 52.2020 (Pennsylvania's SIP).
[2] 35 P.S. § 4005.

PADEP evaluates applications and issues the appropriate air permits for constructions of new emission sources or for modifications to existing emissions sources.[3]

PennFuture has filed suit under Section 304 of the CAA, which provides:

> [A]ny person may commence a civil action on his own behalf - . . . (3) against any person who proposes to construct or constructs any new or modified major emitting facility without a permit required under . . . part D of subchapter I of this chapter (relating to nonattainment)[4] or who is alleged to have violated (if there is evidence that the alleged violation has been repeated) or to be in violation of any condition of such permit.

42 U.S.C. § 7604(a)(3) ("Section 304").  Anyone proposing to construct a "major emitting" source of pollutants must obtain the proper permit before construction.[5]  The CAA defines a "major emitting facility" as found in Section 304 as "any stationary facility[6] or source of air pollutants which directly emits, or has the potential to emit, one hundred tons per year or more of any air pollutant." 42 U.S.C. § 7602(j).[7]

Defendant's compressor stations emit $NO_x$.   Under the applicable state NNSR regulations, an NNSR permit is required for the construction of a new major facility that emits or

---

[3] 35 P.S. §§ 4004 and 4006.1.

[4] "The term 'nonattainment area' means, for any air pollutant, an area which is designated 'nonattainment' with respect to that pollutant within the meaning of section 7407(d) of this title." 42 U.S.C. § 7501(2). Pennsylvania has been designated a nonattainment area and is therefore subject to the requirements of 42 U.S.C. §§ 7501-7515. Anyone seeking to construct and operate a major source in a nonattainment area in Pennsylvania must comply with the preconstruction permitting requirements under the NNSR program. *See* 35 P.S. § 4006.1(a) ("No person shall construct, assemble, install or modify any stationary air contamination source, or install thereon any air pollution control equipment or device unless such person has applied to and received written plan approval from the department to do so."); 25 PA. CODE § 127.201(a) ("A person may not cause or permit the construction or modification of an air contamination facility in a nonattainment area or having an impact on a nonattainment area unless the Department or an approved local air pollution control agency has determined that the requirements of this subchapter [Subchapter E] have been met."). Subchapter B deals with Prevention of Significant Deterioration ("PSD") standards that are not at issue in this case, and therefore, will not be discussed.

[5] *See* 42 U.S.C. §§ 7475(a), 7502(c)(5); 40 C.F.R. § 51.165(a)(1).

[6] A "facility" is defined as "[an] air contaminant source or a combination of air contaminant sources located on one or more contiguous or adjacent properties and which is owned or operated by the same person under common control." 25 PA. CODE § 121.1.

[7] *See also* 40 C.F.R. § 51.165(a)(1)(iv)(A)(2)(ii); PADEP Guidance for Performing Single Stationary Source Determinations for Oil and Gas Industries, Doc. No. 270-0810-006 (Oct. 12, 2011) ("PADEP Guidance").

has the potential to emit 100 tons per year or more of $NO_x$. 25 PA. CODE § 127.201. In lieu of NNSR permits, PADEP may also issue less stringent general plan approvals and general permits,[8] but only if the source is not subject to the NNSR requirements in Subchapter E. *Id.* Otherwise, an owner or operator must undergo the more onerous process of obtaining plan approval and receiving an operating permit on a case-by-case basis. *Id.*

Among the general permits discussed above, PADEP developed GP-5, which authorizes the construction and operation of natural gas production facilities. Like other general permits, a GP-5 may not be used if the construction or modification for which authorization is sought triggers NNSR requirements under Subchapter E. PADEP issued seven GP-5s to Ultra to construct and operate various compressor stations and associated equipment, which Ultra built beginning in 2009. (Compl., ¶¶ 2, 38-39, 45-46, 52-53, 59-60, 66-67, 73-74, 80-81). Each of the seven compressor stations emits less than 100 tons per year of $NO_x$, so Ultra did not apply for a Part D permit.

Plaintiff argues that the seven compressor stations should have been aggregated as a single source, rendering GP-5s for Ultra's facilities inappropriate. PADEP must determine whether a facility or facilities are a "single source" when "an air contamination source or combination of air contamination sources located on one or more contiguous or adjacent properties" is or are "owned and operated by the same person under common control." 25 PA.

---

[8] *See* 25 PA. CODE § 127.611. PADEP may issue a "general plan approval or a general permit for any category of stationary air contamination source if the department determines that the sources in such category are similar in nature and can be adequately regulated using standardized specifications and conditions." 35 P.S. § 4006.1(f).

CODE § 127.204(a).[9] If the emissions from multiple sources are aggregated as a single source and those emissions reach major source thresholds, they would be considered a "single source" subject to Part D permit requirements under the NNSR and therefore ineligible for a GP-5.

The APCA specifically provides: "Any person aggrieved by an order or other administrative action of [PADEP] issued pursuant to this act . . . shall have the right, within thirty (30) days from actual or constructive notice of the action, to appeal the action to the hearing board . . . ." 35 P.S. § 4010.2; *see also* 25 PA. CODE § 1021.52(a)(2). Failure to timely appeal to the EHB precludes further challenges to PADEP's action. *See* 35 P.S. § 7514(c) ("If a person has not perfected an appeal in accordance with the regulations of the [EHB], the department's action shall be final as to the person.").

Parties dissatisfied with final decisions of the EHB have the right to appeal to the Commonwealth Court and, from there, to the Pennsylvania Supreme Court. 42 PA. CONS. STAT. § 763(a)(1); 42 PA. CONS. STAT. §§ 723-724. Plaintiff, however, did not seek to appeal any of PADEP's seven permitting decisions to the EHB.[10] Instead, Plaintiff filed this Complaint in federal district court after Ultra constructed its facilities pursuant to PADEP's authorizations. Thus, Ultra argues that PennFuture has forfeited its right to seek judicial redress by failing to appeal any of PADEP's permitting decisions to the EHB.

---

[9] In late 2011, PADEP issued guidance for determining when sources should be considered contiguous or adjacent for the purpose of determining whether aggregation is appropriate. *See* PADEP Guidance, *supra* note 7.

[10] It appears that PADEP duly published its seven permitting decisions in the Pennsylvania Bulletin as required by 25 PA. CODE §§ 127.611(b), (c), 127.612. (Zaman Aff., Doc. 30, App. C; at ¶ 10). At any rate, PennFuture does not argue that PADEP failed to put the public on notice regarding PADEP's permitting decisions in this case.

### III. Analysis

#### a. Subject-Matter Jurisdiction

When presented with a motion to dismiss attacking the factual basis for subject-matter jurisdiction, a district court is not bound to accept the allegations in the complaint as true, but is instead "entitled to independently evaluate the evidence to resolve disputes over jurisdictional facts." *S.R.P. ex. rel. Abunabba v. U.S.*, 676 F.3d 329, 332 (3d Cir. 2012) (citing *Mortensen v. First Fed. Sav. & Loan Ass'n*, 549 F.2d 884, 891 (3d Cir. 1977) ("the district court is free to weigh the evidence and satisfy itself as to the existence of its power to hear the case.")). The party asserting the court's jurisdiction bears the burden of proving such jurisdiction exists. *Nuveen Mun. Trust ex rel. Nuveen High Yield Mun. Bond Fund v. WithumSmith Brown, P.C.*, No. 10-4633, 2012 WL 3518015, at *6, -- F.3d – (3d Cir. 2012).

As an initial matter, the Court concludes that it has jurisdiction to hear this case based on a plain reading of Section 304 and two cases to which Plaintiff cites in which the courts found they had subject-matter jurisdiction under Section 304(a)(3):

> [A]ny person may commence a civil action on his own behalf- . . . *(3) against any person who proposes to construct or constructs any new or modified major emitting facility without a permit required under . . . part D of subchapter I of this chapter (relating to nonattainment)* or who is alleged to have violated (if there is evidence that the alleged violation has been repeated) or to be in violation of any condition of such permit.

42 U.S.C. § 7604(a)(3) (emphasis added).[11]

---

[11] Because the language of the statute is plain on its face, the Court need not look any further to discern Congress's intent. *Alston v. Countrywide Financial Corp.*, 585 F.3d 753, 759 (3d Cir. 2009) ("When the statute's language is plain, the sole function of the courts—at least where the disposition required by the test is not absurd—is to enforce it according to its terms.") (internal citations and quotation marks omitted)). Based on a Senate

In *Ogden Projects v. New Morgan Landfill Co.*, the defendant had obtained a solid waste landfill permit from PADER in lieu of an air contamination permit. 911 F. Supp. 863, 967-68 (E.D. Pa. 1996). That is, no air permit had been issued at all. Neither had the solid waste permit required the defendant to obtain a Part D permit.[12] The primary basis on which the court concluded it had subject-matter jurisdiction was the plain language of Section 304(a)(3). Because the plaintiff contended that the defendant had failed to obtain a Class D permit before constructing its landfill, the court concluded it had jurisdiction. Likewise, PennFuture claims that Ultra failed to obtain a Class D permit before constructing its compressor stations, properly alleging facts (which Ultra does not dispute) from which the Court can conclude it has jurisdiction to hear the case.

Similarly, in *Weiler v. Chatham Forest Products, Inc.*, the defendant had not obtained a Part D air permit for major source facilities. 392 F.3d 532 (2d Cir. 2004). Instead, it had obtained a "synthetic minor source permit" because it claimed the New York Department of Environmental Conservation ("NYDEC") had determined that a major source permit was

---

Committee Report, though, Ultra argues that Congress intended for citizen suits to exhaust administrative remedies before filing in federal court. The report does not support Ultra as much as it believes it does:

> in order to challenge the legality of a permit which a State has actually issued, or proposes to issue, under section 110(g) [proposed Part C to the CAA], however, a citizen must seek administrative remedies under the State permit consideration process, or judicial review of the permit in State court.

S. REP. NO. 94-717, at 82 (1976) (Comm. Rep.). Even were the Court to accept the argument that exhaustion of administrative remedies was required, this requirement would not apply here because PADEP has neither "actually issued" nor "propose[d] to issue" either a Part C or D permit to Ultra. Instead, it has expressly determined that GP-5s – not covered by Section 304 – are sufficient. Furthermore, a Conference Report dated later in time than the Committee Report states "[n]o administrative or procedural requirements . . . are imposed". S. REP. NO. 94-1742, at 115 (1976) (Conf. Rep.). Therefore, the Court rejects Ultra's argument, based on legislative history, that Congress intended for citizens to exhaust administrative remedies before initiating suit in federal court.

[12] The parties stipulated to a statement of facts which they submitted to the court for non-jury resolution. Ultimately, the court concluded that it had subject-matter jurisdiction over the case and ruled in favor of the defendant on the merits.

unnecessary. The court held that simply because alternative enforcement mechanisms were available in state court did not foreclose the existence of a federal cause of action. Furthermore, Weiler had clearly met its pleading requirements because, as in *Ogden* and here, it alleged that Chatham had failed to obtain a Part D permit. The Court was not persuaded by Chatham's arguments that Weiler was attempting to collaterally attack NYDEC's decision to issue a synthetic minor permit instead of a Part D permit. "[A] state determination that a prospective source of air pollution is not a major emitting facility does not prevent a private plaintiff from bringing a suit seeking to enjoin the construction of the facility pursuant to . . .§ 7604(a)(3)." *Id.* at 539.

Notably, *Natural Resources Defense Council, Inc. v. BP Products North America, Inc.*, a case on which Ultra relies in its arguments in favor of *Burford* abstention, followed the Second Circuit's decision in *Weiler*. No. 2:08-CV-204, 2009 WL 1854527 (N.D. Ind. June 26, 2009). In *BP Products*, the court recognized the similarities between its case and *Weiler*, noting that BP had obtained "only . . . a state law minor permit, and not one required under Part C or D." *Id.* at *8. In its analysis, the court said "the Second Circuit essentially reviewed the allegations of the complaint and determined that they claimed the defendant proposed to construct a major emissions facility without a permit under parts C or D. That was enough for jurisdiction." *Id.* (internal citations omitted). Thus, the Court is persuaded that it has subject-matter jurisdiction over this case.

Defendant relies on a handful of cases for the proposition that PennFuture is collaterally attacking the DEP's decision to issue a minor source permit rather than a major source permit, but these cases are inapposite.

In *Sierra Club v. Wellington Dev.-WVDT, LLC*, several citizen groups challenged PADEP's approval of Wellington's application to build a power plant.  No. 08-293, 2008 WL 2048332 (W.D. Pa. May 13, 2008).  The approval provided that the permit expired if Wellington did not commence construction within eighteen months of the permit's issuance. Consequently, PADEP determined that Wellington had complied with all relevant statutes and the terms of the permit itself.  The plaintiffs appealed PADEP's approval of the plan to the EHB, but the EHB dismissed the appeals.  On appeal to the Commonwealth Court of Pennsylvania, the court affirmed EHB's dismissal of the appeal, and the Supreme Court of Pennsylvania denied leave to appeal.  After failing to succeed in state court, the plaintiffs then filed suit in federal court under Section 304(a)(3) of the CAA alleging that the permit was invalid because Wellington had not commenced construction within eighteen months of the permit's issuance. However, the court found that the plaintiffs were collaterally attacking the permit because PADEP had already determined that Wellington had commenced construction within eighteen months of the permit's issuance.  The court thus dismissed the case for lack of subject-matter jurisdiction.  There is no parallel situation here.

In *Defenders of Conewango Creek v. Echo Devs., LLC*, the same federal court found that the plaintiff had failed to challenge the permits at issue with the EHB but had instead come to federal court.  No. 06-242E, 2007 WL 3023927 (W.D. Pa. Oct. 12, 2007).  The court

concluded that the counts at issue in the motion to dismiss for lack of subject-matter jurisdiction

all contained allegations that Echo had failed to meet the terms of the permits themselves.

> After reviewing the First Amended Complaint and parties' arguments, it is
> evident that the Plaintiff is in those counts challenging final Pennsylvania-issued
> permits. Indeed, this tug-of-war between the parties about the Pennsylvania
> permits, when they were issued, under what circumstances, with what
> knowledge, with what coverage, and using what definitions, perfectly illustrates
> that such challenges are properly brought in the Pennsylvania courts, with the
> state able to defend the permit decision and terms, and not here in federal court,
> a court of limited jurisdiction.

*Id.* at *9. Thus, the plaintiffs were not claiming that Echo had failed to obtain a permit required

by Section 304(a)(3), but rather, that it was not complying with the terms of the permits it *had*

received. This was a blatant collateral attack on the permits and should have been pursued in

state court rather than federal court.[13]

In *CleanCOALition v. TXU Power*, 536 F.3d 469 (5th Cir. 2008), the Fifth Circuit affirmed

the district court's dismissal of the case based on the district court's interpretation of Section

304(a)(3). To the district court, the CAA authorizes citizen suits when an "entity proposes to

construct or constructs a facility without a permit whatsoever." *Id.* at 478-79. The Fifth Circuit

explicitly rejected the plaintiff's proposed interpretation of Section 304(a)(3) of "without a permit

*that complies with the CAA.*" *Id.* at 479 n.13. It "decline[d] to rewrite the plain language of the

statute," especially because TXU had applied for and obtained a state permit after the plaintiff

had initially filed suit. *Id.* at 479. Thus, the Court concluded that Section 304(a)(3) "does not

---

[13] The Court notes that Section 304 provides that a citizen group may file suit "against any person who . . .
is alleged to have violated (if there is evidence that the alleged violation has been repeated) *or to be in violation of
any condition of such [Part D] permit.*" (emphasis added). It appears that the plaintiff had sufficiently alleged that
the defendant was violating the condition of its permit, but because there is no allegation in this case that Ultra
violated a condition of a Part D permit, that particular portion of *Defenders of Conewango Creek* has no application
here.

authorize preconstruction citizen suits against facilities that have either obtained a permit or are in the process of doing so." *Id.* In reaching this conclusion, the Fifth Circuit cited *Ogden* for the proposition that Section 304(a)(3) "authorizes citizen suits when facility is proposing to construct plant without a permit at all." *Id.*

*National Parks Conservation Association v. Tennessee Valley Authority*, 175 F. Supp. 2d 1071, 1078 (E.D. Tenn. 2001) is even less helpful to Ultra's cause. There, the court dismissed the case for lack of subject-matter jurisdiction because the plaintiff had failed to comply with the notice provisions of the CAA. Alternatively, it concluded that the plaintiff was collaterally attacking the SIP, not a permit, of Tennessee's Department of Environment and Conservation (TDEC), which could not serve as the basis for a citizen suit under 304(a)(3). *Id.* at 1073. Instead, it said that "there is no citizen suit provision allowing a citizen plaintiff to challenge an emission standard or limitation, and that is what plaintiff here seeks to do. Quite simply, plaintiff's dispute is with the State of Tennessee through TDEC for issuing these permits" without receiving approval from the EPA beforehand. *Id.* at 1079.

Because the Court finds the language of Section 304 clear and the reasoning in *Ogden* and *Weiler* persuasive, while Ultra's cited cases are inapplicable, it determines it has subject-matter jurisdiction. Nonetheless, the Court is disturbed by PennFuture's inaction during the state administrative appeals period, especially in light of Ultra's representation that it has completed construction of its seven compressor stations. (Doc. 16, at 3). Defendant argues that PennFuture should have exhausted its state and administrative remedies before proceeding in federal court. 35 P.S. § 4010.2.; 25 PA. CODE § 1021.52(a)(2). Though *Weiler*

clearly favors Plaintiff's position, the Second Circuit inserted a cautionary footnote qualifying its opinion:

> We note that we have ruled in the section 304(a)(1) context that plaintiffs must exhaust administrative and state judicial remedies before proceeding in federal court. A similar requirement may apply in the section 304(a)(3) context. But because the exhaustion issue is not before us, we do not here rule whether plaintiffs are required to exhaust their permit challenge in the state courts.

*Weiler*, 392 F.3d at 538 n.8 (internal citations omitted).

If the Court were to find an exhaustion requirement in Section 304(a)(3), PennFuture would be left without a remedy because the 30-day window in which to appeal any PADER decision to the EHB has lapsed. (*See* Zaman Aff., Doc. 30, App. C; 35 P.S. § 7514(c)). On the other hand, if the Court does not find an exhaustion requirement, the decision would create perverse incentives for any citizen group to intentionally miss its window to appeal to the EHB and come directly to federal court. In *BP Products*, though the court ultimately decided to abstain on *Burford* and *Colorado River* grounds, it essentially read an exhaustion requirement into the statute by declining to exercise jurisdiction, which would allow citizen groups "to fight the battle on two fronts." This struck the court "as terribly inefficient" and unfair because it gave "opponents of the permit multiple bites of the apple." *BP Products*, 2009 WL 1854527, at *11.

Nevertheless, the Court will not read in an exhaustion requirement where there is none provided, especially in light of the congressional Conference Report which stated no administrative or procedural requirements are imposed.[14] Because the plain language of Section 304(a)(3) gives PennFuture the right to bring a cause of action directly to federal court

---

[14] *See supra* note 11.

as recognized by *Ogden* and *Weiler*, the Court finds it has subject-matter jurisdiction to hear the case. Ultra argues, however, that even if the Court has jurisdiction, it should abstain from exercising that jurisdiction due to federalism concerns.

### b. Abstention

Federal courts have a "virtually unflagging obligation to exercise the jurisdiction given them." *Baykeeper v. NL Industries, Inc.*, 660 F.3d 686 (3d Cir. 2011) (citing *Colo. River Water Conservation Dist. v. United States*, 424 U.S. 800, 817, 96 S. Ct. 1236, 47 L. Ed. 2d 483 (1976)). The framework for determining when abstention under *Burford*[15] is proper has been set forth by the Supreme Court as follows:

> Where timely and adequate state-court review is available,[16] a federal court sitting in equity must decline to interfere with the proceedings or orders of state administrative agencies: (1) when there are difficult questions of state law bearing on policy problems of substantial public import whose importance transcends the result in the case then at bar; or (2) where the exercise of federal review of the question in a case and in similar cases would be disruptive of state efforts to establish a coherent policy with respect to a matter of substantial public concern.

---

[15] *Burford v. Sun Oil Co.*, 319 U.S. 315, 63 S. Ct. 1098, 87 L. Ed. 1424 (1943). There, the Court declined to exercise its jurisdiction to hear a challenge to a Texas Railroad Commission ("TRC") permit allowing the defendant to drill for oil. 319 U.S. at 316–17. Texas had established TRC to address issues related to oil extraction in the absence of any significant federal regulation. *See id.* at 318–20 ("The federal government, for the present at least, has chosen to leave the principal regulatory responsibility with the states, but does supplement state control."). TRC evaluated permit applications and its decisions were subject to review by multiple state courts. *Id.* at 325–26. However, judicial review ran through one county only to assure uniformity. *Id.* at 326–27. The Court concluded that abstention was necessary because "[t]he very 'confusion' which the Texas legislature and Supreme Court feared might result from review by many state courts of the Railroad Commission's orders has resulted from the exercise of federal equity jurisdiction." *Id.* at 327.

[16] There is little doubt that timely and adequate state-court review is available with respect to PADEP's permitting decisions.

*New Orleans Public Service, Inc. v. Council of City of New Orleans*, 491 U.S. 350, 361, 109 S.

Ct. 2506, 105 L. Ed. 2d 298 (1989) ("NOPSI") (internal quotation marks and citations omitted).[17]

The court in *BP Products* found that there were no difficult questions of state law[18]

bearing on the matter, so if abstention were proper, it must be on the grounds that the exercise

of jurisdiction would disrupt state efforts to establish a coherent policy with respect to a matter

of substantial public concern.  Like the court in *BP Products*, this Court concludes that the issue

of whether PADEP should have aggregated the seven Ultra compressor stations before issuing

the appropriate permit(s) is not a difficult question of state law.  Therefore, the Court must

determine whether the second prong of *Burford* applies and must examine:

> (1) whether the particular regulatory scheme involves a matter of substantial
> public concern; (2) whether it is the sort of complex technical regulatory scheme
> to which the *Burford* abstention doctrine usually is applied; and (3) whether
> federal review of a party's claims would interfere with the state's efforts to
> establish and maintain a coherent regulatory policy.

*Hi Tech Trans, LLC v. New Jersey*, 382 F.3d 295, 304 (3d Cir. 2004).

The primary basis for the decision to abstain in *BP Products*, though, was the existence

of parallel state court proceedings.  Thus, it concluded, "the state gets to answer [the] question

[of whether a Part C or D permit was required] first."  *BP Products*, 2009 WL 1854527, at *11.

---

[17] In *BP Products*, the court abstained on both *Burford* and *Colorado River* grounds, but in this case, only *Burford* is relevant because there are no parallel state court proceedings.

[18] PennFuture argues that federal law controls here, and thus, the first *Burford* test is inapplicable. (EPA Comments on PADEP Guidance, Doc. 27, App. C, "the definition of 'source' as used in the SIP is a matter of federal law.").  Ultra argues that even the EPA's own letter to PADEP indicates that "PADEP retains the discretion to 'consider the factors relevant to the specific circumstances of the permitted activities.'" (Letter dated Nov. 21, 2011, Doc. 28, Ex. A); *see also* Oil and Natural Gas Sector: New Source Performance Standards and National Emissions Standards for Hazardous Air Pollutants Reviews, Proposed Rule, 76 Fed. Reg. 52,738, 52,751 (Aug. 23, 2011) (same).  In light of Pennsylvania's statutory and regulatory framework outlined above and the cases on which the parties rely which also concluded that this was a matter of state law (*see, e.g.*, *Ogden, BP Products*), the Court concludes that Pennsylvania law will control whether PADEP properly issued GP-5 permits in lieu of Part D permits.

"And while the issues may ultimately wind up in federal court again, if they do, then at least the federal court will have the benefit of the full state analysis." *Id.* at \*12. No such parallel proceedings exist here, rendering *BP Products* of little applicability with respect to the abstention analysis in this case.

Undoubtedly, the air permitting regulatory scheme is a matter of substantial public concern, and it may even be the type of complex technical regulatory scheme to which *Burford* abstention is normally applied. But based on the parties' agreement that these types of permitting decisions must be made on a case-by-case basis, the Court does not see how its participation in this case would interfere with the state's efforts to maintain a coherent regulatory policy. PADEP's decision to issue a certain type of permit to Ultra should have little to no bearing on its decision to issue an air permit to another entity, especially if that entity is located in another region of the state.

Once again, Ultra's cited cases are inapposite. *Palumbo v. Waste Technologies, Indus.*, 989 F.2d 156 (4th Cir. 1993) involved a claim brought under the Resource Conservation and Recovery Act, 42 U.S.C. §§ 1691 *et seq.* which explicitly provided for review of the administrator's action "by the Circuit Court of Appeals of the United States for the Federal judicial district in which such person resides." No such statutory review provision exists in Section 304(a)(3) of the CAA. Similarly, in *Ellis v. Gallatin Steel Co.*, 390 F.3d 461 (6th Cir. 2004), *Sugarloaf Citizens Ass'n v. Montgomery County*, 33 F.3d 52 n.9 (4th Cir. 1994), and *Jamison v. Longview Power, LLC*, 493 F. Supp. 2d 786 (N.D. W. Va. 2007), the relevant state

agencies had either issued or were in the process of issuing Part C or D permits, bolstering the argument that federal intervention would add only confusion to the mix.

As further support for its argument for abstention, Ultra states that there are currently two cases pending[19] before the EHB on the precise question of whether the emissions from an entity's facilities should be aggregated or examined separately when PADEP considers applications for air contamination source permits.  However, as PennFuture points out, these permitting decisions should be made on a case-by-case basis,[20] thereby severely limiting any sort of precedential value one determination may have on another.[21]  Furthermore, Plaintiff notes that neither of the two cases pending before the EHB involve either of the parties in this case nor the specific region (e.g., Marcellus Shale), further reducing the value of the outcome of these two cases.

Having surveyed the existing case law on the matter, the Court recognizes that it is difficult to harmonize all of the cases cited above.  In the absence of controlling precedent from the Third Circuit, the Court must be guided by the plain language of Section 304, the elements necessitating abstention set forth of *Burford* and its progeny, and its own considered judgment. Though Ultra argues that PennFuture deliberately avoided Pennsylvania's administrative appeal requirements, the Court's view is it would be improper to abstain from exercising

---

[19] *Group Against Smog and Pollution v. DEP*, EHB Docket No. 2011-065-R; *Clean Air Council v. DEP*, EHB Docket No. 2011-072-R.

[20] PADEP Guidance for Performing Single Stationary Source Determinations for Oil and Gas Industries, Doc. No. 270-0810-006 (Oct. 12, 2011).

[21] In its amicus brief, PADEP asserts that it is in the process of establishing technical guidance on single source determinations. (Doc. 30, at 22).  However, given the fact-specific nature of each permit application, such guidance would be of little use generally.

jurisdiction when Congress has clearly established a cause of action for citizen suits in Section 304 of the CAA.

## IV. Conclusion

For the foregoing reasons, the Court will deny Defendant Ultra's motion to dismiss for lack of subject-matter jurisdiction and will also deny Ultra's motion to abstain.  A separate Order follows.

Robert D. Mariani
United States District Judge

17