THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| CITIZENS FOR PENNSYLVANIA'S FUTURE, | : | |
| Plaintiff | : | |
| v. | : | 4:11-CV-1360 |
| | : | (JUDGE MARIANI) |
| ULTRA RESOURCES, INC., | : | |
| | : | |
| Defendant | : | |

## MEMORANDUM OPINION

### I. INTRODUCTION AND PROCEDURAL HISTORY

On July 21, 2011, Plaintiff, Citizens for Pennsylvania's Future ("PennFuture"), filed

this citizen suit against Defendant, Ultra Resources, Inc. ("Ultra"), for alleged violations of

the Clean Air Act ("CAA"), 42 U.S.C. §§ 7401 et seq., Pennsylvania's State Implementation

Plan ("SIP"), and Pennsylvania's New Source Review regulations, 25 PA. CODE 127(E).

(Compl., Doc. 1). PennFuture contended that Ultra built a major facility which produces

nitrogen oxide ("$NO_x$") emissions without obtaining the appropriate nonattainment New

Source Review ("NNSR") permit under the state regulations contained in 25 PA. CODE

127(E). Ultra responded that it properly applied for and received less stringent permits (GP-

5s) from the Pennsylvania Department of Environmental Protection ("PADEP"). In issuing

these GP-5s, PADEP decided to issue a permit to each of the eight compressor stations at

issue as individual $NO_x$ emitting facilities instead of aggregating these facilities. If PADEP

had aggregated the facilities, Ultra would have needed a major source permit.

Ultra subsequently filed a motion to dismiss for lack of subject-matter jurisdiction

(Doc. 9), arguing that the proper forum for PennFuture to challenge the issuance of the GP-

5 permits was before the Pennsylvania Environmental Hearing Board ("EHB"). This Court

denied Ultra's motion on September 24, 2012, finding the plain language of Section

304(a)(3) of the CAA gave PennFuture the right to bring a cause of action directly to federal

court thus giving the Court subject matter jurisdiction to hear the case and further

determining that because Congress has clearly established a cause of action for citizen

suits in Section 304 of the CAA, it would be improper for the Court to abstain from

exercising its jurisdiction. (Doc. 35).

Following the completion of fact discovery, on February 28, 2014, Ultra filed a motion

for summary judgment (Doc. 55). In support of its motion, Ultra contends that summary

judgment is appropriate because "[Ultra] obtained all necessary air permit approvals for its

compressor stations in Tioga and Potter Counties and did not construct a major source of

$NO_x$ emissions." (Doc. 55, ¶ 30). PennFuture opposes summary judgment, originally

contending that "there are genuine issues of fact concerning whether Ultra's compressor

stations are physically proximate and functionally interrelated."[1] (Doc. 59, ¶ 30). At the

request of both parties (Docs. 63, 64), on April 21, 2014, the Court held oral argument on

Defendant's motion. As a result of the oral argument, PennFuture submitted a

---

[1] Plaintiff later abandoned this position in its Supplemental Statement Concerning Disputed Issues of Fact, stating that "[w]ith respect to the functional and operational interrelatedness of Ultra's sources . . ., it is PennFuture's position that the current record contains all of the facts material to a determination by this Court of whether Ultra's compressor stations are functionally and operationally interrelated." (Doc. 70, ¶ 6).

Supplemental Statement Concerning Disputed Issues of Fact (Doc. 70) on May 5, 2014, to which Ultra promptly responded (Doc. 71).

The motion for summary judgment has been fully briefed and is now ripe for review. For the reasons that follow, we will grant Defendant's motion for summary judgment.

## II. STATEMENT OF UNDISPUTED FACTS

In accordance with Local Rule 56.1, Ultra has submitted a Statement of Material Facts as to which it submits there is no genuine issue for trial. (Doc. 55). PennFuture has submitted its response to Ultra's Statement of Material Facts (Doc. 59) with the result that 20 of the 30 numbered paragraphs of Defendant's Statement of Material Facts have been admitted by the plaintiff, with many others admitted in part. Those which have been denied in whole or part raise no material issues of fact.

Ultra operates 13 producing gas well pads in Potter and Tioga Counties in Pennsylvania (Doc. 55, ¶ 11)[2] as well as the following eight compressor stations in these counties (*id.* at ¶ 1): (1) Ken Ton; (2) Kjelgaard; (3) Button; (4) Lick Run; (5) Pierson 810; (6) Pierson 801; (7) State 815; and (8) Thomas 808. Each of the compressor stations is located on a well pad location. (*Id.* at ¶ 13). The compressors are set after the well pad locations are built and the wells are drilled, and the compressors are not involved in the well pad and piping planning. (*Id.*). Although Ultra's operations in Potter County and Tioga County cover over 500 square miles, the compressor stations, well pads, and pipelines are

---

[2] Although well pads were built at Hillside, Simonetti, Fowler and Martin, no wells were drilled. (Doc. 55, ¶ 11).

within an area approximately six to seven miles across and three or four miles wide, or roughly 30 square miles. (Dep. of Daniel Bulfer, Doc. 57, Ex.3, at 23; Doc. 60 at 9; Doc. 62 at 5-6). If lines were only drawn between Ultra's eight compressor stations, the total area within the lines would be less than five square miles. (Doc. 70, ¶ 5; Doc. 71, at 1-2).

While none of Ultra's compressor stations individually has the capacity to emit more than 100 tons per year ("TPY") of $NO_x$, collectively the eight stations could potentially emit over 100 TPY of $NO_x$.

The Ken Ton compressor engine and ancillary equipment, located in Potter County, became operational on or about September 13, 2011 and the station is authorized under air permit approval GP5-53-110, issued on February 10, 2011, with a total facility potential to emit $NO_x$ of 13.88 TPY. (Doc. 55, ¶ 3).

The Kjelgaard compressor engine and ancillary equipment, located in Tioga County, became operational on or about November 18, 2010, and were originally authorized under air permit approval GP5-59-193, issued on September 21, 2009, with a total facility potential to emit $NO_x$ of 14.47 TPY and were later authorized under amended permit approval GP5-59-193A, issued on September 28, 2010, with a total facility potential to emit $NO_x$ of 8.78 TPY. (*Id.* at ¶ 4).

The Button compressor engine and ancillary equipment, located in Potter County, became operational on or about October 3, 2010, and were originally authorized under air permit approval GP5-53-105, issued on November 13, 2009, with a total facility potential to

4

emit $NO_x$ of 21.81 TPY and were later authorized under amended permit approval GP5-53-105A, issued on August 23, 2010, with a total facility potential to emit $NO_x$ of 22.47 TPY. (*Id.* at ¶ 5). By amended permit approval GP5-53-105B, issued on February 10, 2011, an additional engine and the same equipment were approved with a total facility potential to emit $NO_x$ of 41.89 TPY but because no further well drilling is planned, the second engine was never installed nor is there any plan to install a second engine at this site. (*Id.*).

The Lick Run compressor engine and ancillary equipment, located in Tioga County, became operational on or about September 5, 2010, and were originally authorized under air permit approval GP5-59-198, issued on November 13, 2009, with a total facility potential to emit $NO_x$ of 21.81 TPY and were later authorized under amended permit approval GP5-59-198A, issued on August 25, 2010, with a total facility potential to emit $NO_x$ of 22.47 TPY. (*Id.* at ¶ 6).

The Pierson 810 compressor engine and ancillary equipment, located in Tioga County, became operational on or about May 16, 2011 and are authorized under air permit approval GP5-59-215, issued on January 11, 2011, with a total facility potential to emit $NO_x$ of 23.39 TPY. (*Id.* at ¶ 7).

The Pierson 801 compressor engine and ancillary equipment, located in Tioga County, became operational on or about April 5, 2010, and were originally authorized under air permit approval GP5-59-194, issued on September 21, 2009, with a total facility potential to emit $NO_x$ of 14.48 TPY. (*Id.* at ¶ 8). By amended permit approval GP5-59-194A, issued

on December 27, 2013, an identical replacement engine and different equipment were approved with a total facility potential to emit $NO_x$ of 14.9 TPY. (*Id.*).

The State 815 compressor engine and ancillary equipment, located in Tioga County, became operational on or about March 2, 2011, and were originally authorized under air permit approval GP5-59-212, issued on November 8, 2010, with a total facility potential to emit $NO_x$ of 22.48 TPY and were later authorized under amended permit approval GP5-59-212A, issued on January 24, 2011, with a total facility potential to emit $NO_x$ of 7.09 TPY. (Doc. 55, ¶ 9).

The Thomas 808 compressor engine and ancillary equipment, located in Tioga County, which became operational on or about February 7, 2011, are authorized under air permit approval GP5-59-214, issued on December 1, 2010, with a total facility potential to emit $NO_x$ of 22.48 TPY. (*Id.* at ¶ 10).

Once a well was operational and required compression, compressor stations to serve the wells were installed. (*Id.* at ¶ 14). When each compressor station was initially installed, it compressed gas from wells on the location where it was installed and wells from other locations may also have supplied gas. If the compressor shut down or stopped working, the wells serviced by that compressor could not produce unless and until the wells built up enough pressure to produce without compression. Specifically, the Coon Hollow, Paul, Mitchell, and Button wells were serviced by the Button compressor; the Ken Ton wells were originally serviced by the Button Compressor Station but after the Ken Ton

6

Compressor Station was added, the Ken Ton wells were compressed at Ken Ton; the Pierson 801 wells were serviced by the Pierson 801 Compressor Station; the Thomas and Marshland Unit #1 wells were serviced by the Thomas Compressor Station; the Pierson 810 wells were serviced by the Pierson 810 Compressor Station; the Bergey, Kjelgaard, Marshlands #3 (located on the Kjelgaard pad) and the Lick Run wells are serviced by the Lick Run Compressor Station; the Kjelgaard and Marshland Unit #3 wells are compressed by the Kjelgaard Compressor Station; and the State 815 wells are serviced by the State 815 Compressor Station.  (Doc. 55, ¶ 15).

Subsequently, because of excess capacity at certain compressor stations resulting from both decreasing well production and compressors that were originally sized to handle additional wells not drilled, Ultra decided that, while not necessary for production, efficiencies could be achieved by using the Kjelgaard compressor as a satellite to the Lick Run compressor, by using the Pierson 801 compressor as a satellite to the Thomas compressor, and by using the Ken Ton compressor as a satellite to the Button compressor. (*Id.* at ¶ 16).  Gas can only flow in one direction between each of these sets of compressors; specifically, gas only flows from the Kjelgaard compressor to the Lick Run compressor, from the Pierson 801 compressor to the Thomas compressor, and from the Ken Ton compressor to the Button compressor.  Consequently, the Kjelgaard and Marshland #3 wells can be serviced by the Lick Run Compressor Station; the Pierson 801 wells can be serviced by the Thomas Compressor Station; and the Ken Ton wells can be serviced by the Button

Compressor Station. (*Id.* at ¶ 17). The combined $NO_x$ potential to emit for each of the

satellite compressor pairs is: Kjelgaard/Lick Run: 31.25 TPY (as permitted); Pierson

801/Thomas 808: 37.38 TPY (as permitted); Ken Ton/Button: 55.77 TPY (as permitted) and

36.35 TPY (as built with one engine at Button). (*Id.* at ¶ 24).

It is undisputed that the gas from all of Ultra's wells in Potter and Tioga Counties is

currently sent to a metering and regulation station connected to Dominion Transmission,

Inc.'s ("Dominion") LN-50 transmission pipeline which adjusts the pressure and amount of

gas that enters Dominion's LN-50 interstate natural gas pipeline and that a Tap Agreement

between Dominion and Ultra governs this tap (Doc. 55, ¶ 18; Doc. 59, ¶ 18). However,

Plaintiff disputes that this metering and regulation station is exclusively a station of

Dominion Transmission, Inc., stating that "some of the equipment at the metering and

regulation station is owned and operated by Ultra, some of the equipment is owned by Ultra

and operated by Dominion, and some of the equipment is owned and operated by

Dominion." (Doc. 59, ¶ 18).[3] Plaintiff also denies that this station does not emit air

contaminants.[4] (*Id.*).

While PennFuture contends that Ultra's compressor stations have not met the proper

GP-5 standards at all times (Doc. 59, ¶ 2), it is undisputed that Ultra obtained GP-5

approval from PADEP to install and operate each of its eight compressor engines and

---

[3] In Ultra's Reply brief, it states it "does not dispute that it operates a portion of the Metering and Regulation Station pursuant to the Tap Agreement with Dominion Transmission, Inc." (Doc. 62, at 8 n.4).

[4] PennFuture disputes that the metering and regulation station does not emit air contaminants due to this station's alleged release of methane (Doc. 59, ¶ 18). However, it admits that the metering and regulation station does not emit $NO_x$. (Doc. 60 at 16; Unoff. Tr. at 59).

ancillary equipment.  (Doc. 55, ¶ 2; Doc. 59, ¶ 2).  It is further undisputed that PennFuture

had actual and/or constructive notice of each GP-5 permit approval issued to Ultra by

PADEP and never appealed any of these GP-5 permit approvals to the Pennsylvania

Environmental Hearing Board.  (*Id.* at ¶¶ 28, 29).

  In Plaintiff's supplemental statement listing purported disputed issues of fact, Plaintiff

states that the following distances exist between the stations (Doc. 70, ¶ 4), to which Ultra

has agreed to stipulate for the purposes of the present motion for summary judgment (Doc.

71, at 1-2):

1. The linear distance between the Ken-Ton compressor station and the Pierson 801
   station is 1.50 miles;

2. The linear distance between the Pierson 801 station and the Kjelgaard station is 1.51
   miles;

3. The linear distance between the Kjelgaard station and the Lick Run station is .98
   mile;

4. The linear distance between the Lick Run station and the State 815 station is 1.21
   miles;

5. The linear distance between the State 815 station and the Pierson 810 station is
   1.69 miles;

6. The linear distance between the Pierson 810 station and the Thomas 808 station is
   1.22 miles;

7. The linear distance between the Thomas 808 station and the Button station is 1.37 miles;

8. The linear distance between the Button station and the Ken Ton station is .86 mile.

If lines were drawn between Ultra's eight compressor stations to delineate these linear distances, the total area within the lines would be less than five square miles.  (Doc. 70, ¶ 5; Doc. 71, at 1-2).

Plaintiff's Supplemental Statement Concerning Disputed Issues of Fact also includes a stipulation as to the precise locations of Ultra's compressors, in terms of latitude and longitude (Doc. 70, ¶ 3), to which Ultra has also agreed to stipulate (Doc. 71, at 1-2).  As a result of the parties' stipulation as to these coordinates, the Court notes that the following distances exist between the compressors:

1. The linear distance between the Ken-Ton compressor and the Thomas 808 compressor is 1.23 miles;

2. The linear distance between the Pierson 801 compressor and the Button compressor is 1.97 miles;

3. The linear distance between the Thomas 808 compressor and the Pierson 801 compressor is .78 mile;

4. The linear distance between the Pierson 810 compressor and the Kjelgaard compressor is .93 mile;

5. The linear distance between the Thomas 808 compressor station and the Lick Run compressor is 3.09 miles;

6. The linear distance between the Lick Run compressor and the Ken-Ton compressor is 3.96 miles;

7. The linear distance between the Lick Run compressor and the Button compressor is 4.43 miles.

## III. STANDARD OF REVIEW

Through summary adjudication, the court may dispose of those claims that do not present a "genuine issue as to any material fact." FED. R. CIV. P. 56(a). Summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c); *Turner v. Schering-Plough Corp.,* 901 F.2d 335, 340 (3d Cir. 1990). "As to materiality, . . . [o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

The party moving for summary judgment bears the burden of showing the absence of a genuine issue as to any material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Once such a showing has been made, the non-moving party must offer specific facts contradicting those averred by the movant to establish a

genuine issue of material fact. *Lujan v. Nat'l Wildlife Fed'n,* 497 U.S. 871, 888, 110 S.Ct.

3177, 111 L.Ed.2d 695 (1990). Therefore, the non-moving party may not oppose summary

judgment simply on the basis of the pleadings, or on conclusory statements that a factual

issue exists. *Anderson,* 477 U.S. at 248. Rather, the opposing party must point to a factual

dispute requiring trial and the district court "may limit its review to the documents submitted

for the purposes of summary judgment and those parts of the record specifically referenced

therein." *Carmen v. San Francisco Unified Sch. Dist.,* 237 F.3d 1026, 1030-1031 (9th Cir.

2001); *see also Forsyth v. Barr,* 19 F.3d 1527, 1537 (5th Cir. 1994). "Inferences should be

drawn in the light most favorable to the non-moving party, and where the non-moving

party's evidence contradicts the movant's, then the non-movant's must be taken as true."

*Big Apple BMW, Inc. v. BMW of N. Am., Inc.,* 974 F.2d 1358, 1363 (3d Cir.1992), *cert.*

*denied* 507 U.S. 912, 113 S.Ct. 1262, 122 L.Ed.2d 659 (1993).

## IV. ANALYSIS

### A. Statutory background.

While federal financial assistance and leadership are necessary for the development

of programs to prevent and control air pollution, "air pollution prevention . . . and air pollution

control at its source is the primary responsibility of States and local governments." 42

U.S.C. § 7401(a)(3)-(4). Thus, consistent with the aims of the CAA, each state must submit

to the EPA for review and approval a state implementation plan ("SIP") "which *provides for*

implementation, maintenance, and enforcement of . . . standard[s] in each air quality control

12

region . . . within such State." 42 U.S.C. § 7410(a)(1). A state agency must be designated

to review applications for major source construction permits under Part D,[5] and each SIP

must use the "specific definitions" established in EPA regulations unless the state's

definitions are "more stringent, or at least as stringent" as the federal definitions. 40 C.F.R.

§ 51.165(a)(1).

To comply with federal standards, Pennsylvania enacted the Air Pollution Control Act

("APCA"), 35 P.S. § 4001 *et seq.* The APCA delegates authority to the Environmental

Quality Board ("EQB") to develop rules and regulations to implement the provisions of the

CAA,[6] and PADEP evaluates applications and issues the appropriate air permits for

constructions of new emission sources or for modifications to existing emissions sources.[7]

Under Section 304 of the CAA:

> [A]ny person may commence a civil action on his own behalf - . . . (3) against
> any person who proposes to construct or constructs any new or modified
> major emitting facility without a permit required under . . . part D of subchapter
> I of this chapter (relating to nonattainment)[8] or who is alleged to have violated

---

[5] *See* 42 U.S.C. §§ 7410(a), 7502(b) & (c), 7503; 40 C.F.R. § 52.2020 (Pennsylvania's SIP).

[6] 35 P.S. § 4005.

[7] 35 P.S. §§ 4004, 4006.1.

[8] "The term 'nonattainment area' means, for any air pollutant, an area which is designated 'nonattainment' with respect to that pollutant within the meaning of section 7407(d) of this title." 42 U.S.C. § 7501(2). Pennsylvania has been designated a nonattainment area and is therefore subject to the requirements of 42 U.S.C. §§ 7501-7515. Anyone seeking to construct and operate a major source in a nonattainment area in Pennsylvania must comply with the preconstruction permitting requirements under the NNSR program. *See* 35 P.S. § 4006.1(a) ("No person shall construct, assemble, install or modify any stationary air contamination source, or install thereon any air pollution control equipment or device unless such person has applied to and received written plan approval from the department to do so."); 25 PA. CODE § 127.201(a) ("A person may not cause or permit the construction or modification of an air contamination facility in a nonattainment area or having an impact on a nonattainment area unless the Department or an approved local air pollution control agency has determined that the requirements of this subchapter [Subchapter E] have been met.").

(if there is evidence that the alleged violation has been repeated) or to be in violation of any condition of such permit.

42 U.S.C. § 7604(a)(3) ("Section 304"). Anyone proposing to construct a "major emitting" source of pollutants must obtain the proper permit before construction.[9] The CAA defines a "major emitting facility" as found in Section 304 as "any stationary facility[10] or source of air pollutants which directly emits, or has the potential to emit, one hundred tons per year or more of any air pollutant." 42 U.S.C. § 7602(j).[11]

Under the applicable state NNSR regulations, an NNSR permit is required for the construction of a new major facility that emits or has the potential to emit 100 tons per year or more of $NO_x$. 25 PA. CODE § 127.201. In lieu of NNSR permits, PADEP may also issue less stringent general plan approvals and general permits,[12] but only if the source is not subject to the NNSR requirements in Subchapter E. *Id.* Otherwise, an owner or operator must undergo the more onerous process of obtaining plan approval and receiving an operating permit on a case-by-case basis. *Id.*

---

[9] *See* 42 U.S.C. §§ 7475(a), 7502(c)(5); 40 C.F.R. § 51.165(a)(1).

[10] A "stationary source" "means any building, structure, facility, or installation which emits or may emit a regulated NSR pollutant." 40 C.F.R. § 52.21(b)(5). Pennsylvania defines a "facility" as "[an] air contaminant source or a combination of air contaminant sources located on one or more contiguous or adjacent properties and which is owned or operated by the same person under common control." 25 PA. CODE § 121.1.

[11] *See also* 40 C.F.R. § 51.165(a)(1)(iv)(A)(2)(ii); PADEP Guidance for Performing Single Stationary Source Determinations for Oil and Gas Industries, Doc. No. 270-0810-006 (Oct. 6, 2012) (hereinafter "PADEP Guidance").

[12] *See* 25 PA. CODE § 127.611. PADEP may issue a "general plan approval or a general permit for any category of stationary air contamination source if the department determines that the sources in such category are similar in nature and can be adequately regulated using standardized specifications and conditions." 35 P.S. § 4006.1(f).

14

Among the general permits discussed above, PADEP developed GP-5, which authorizes the construction and operation of natural gas production facilities. Like other general permits, a GP-5 may not be used if the construction or modification for which authorization is sought triggers NNSR requirements under Subchapter E.[13]

Under Pennsylvania air permitting regulations, a facility is "an air contamination source or combination of air contamination sources[14] located on one or more contiguous or adjacent properties . . . which is owned or operated by the same person under common control." *See* 25 PA. CODE § 121.1. An analysis of whether two or more air contamination sources are a "single source" should be undertaken on a case-by-case basis.[15] If the emissions from multiple sources are aggregated as a single source and those emissions reach major source thresholds, they would be considered a "single source" subject to Part D permit requirements under the NNSR and thus ineligible for a GP-5.

_____

[13] GP-5 is an abbreviated term for the "General Plan Approval and/or General Operating Permit (BAQ-GPA/GP-5), Natural Gas Compression and/or Processing Facilities" which, in relevant part, mandates that "authorization to construct, modify or operate cannot be issued to a [natural gas compression and/or processing] facility if the total emissions from all air contamination sources located at the facility including other sources determined by DEP to be a single source (for the purpose of New Source Review, Title V or Prevention of Significant Deterioration) exceed the [*sic*] major facility threshold during any consecutive 12-month rolling period. The emissions from all sources and associated air pollution control equipment located at a natural gas compression and/or processing facility shall not equal or exceed [100 tons of $NO_x$] on a 12-month rolling sum basis." PADEP, Bureau of Air Quality, *General Plan Approval and/or General Operating Permit Application Instructions, General Permit (BAQ-GPA/GP-5), Natural Gas Compression and/or Processing Facilities*, ¶¶ 1-2, available at http://www.elibrary.dep.state.pa.us/dsweb/Get/Document-105848/2700-PM-BAQ0205%20GP-5%20Application%20Instructions.pdf.

[14] An "air contamination source" is defined as "any place, facility or equipment, stationary or mobile, at, from or by reason of which is emitted into the outdoor atmosphere any air contaminant." 35 P.S. § 4003.

[15] *See* PADEP Guidance, at 4.

Therefore, broadly at issue here is whether Ultra's eight compressor stations each constitute a separate facility or must be aggregated as a single facility for air permitting purposes. It is undisputed that the compressor stations are "under common control" (Doc. 60, at 18; Doc. 78, at 2) and that, while none of the compressor stations individually has the capacity to emit $NO_x$ of 100 TPY or more, the stations collectively have the potential to emit over 100 TPY of $NO_x$ (*see* Doc. 55, ¶¶ 3-10). It is further undisputed that the lands are not contiguous. (Unoff. Tr. of Oral Arg. on Def.'s Mot. for Summ. J., April 24, 2014 (hereinafter "Unoff. Tr."), at 36). As a result, the only specific question is whether a genuine issue of material fact exists as to whether the air contamination sources are "adjacent", thereby rendering Ultra's facilities ineligible for GP-5 permits and requiring Ultra to meet heightened emission permitting requirements.

### B. The standard for determining "adjacent."

In its Supplemental Statement Concerning Disputed Issues of Fact, PennFuture contends that three categories of facts are relevant to the Court's determination of whether Ultra's compressor stations, and any other sources of pollution emitted by Ultra's facilities, are "adjacent": (1) "the linear distances between Ultra's compressors . . ."; (2) "the total area occupied by the compressors"; and (3) "the functional or operational interrelatedness of the compressors." (Doc. 70, ¶ 1). Plaintiff therefore states that "the precise linear distance among Ultra's compressors and the physical area they occupy are disputed issues of fact absent a stipulation by the parties concerning those distances and that area." (*Id.* at ¶ 2).

However, Plaintiff's Supplemental Statement then proceeds to list what it contends are the precise locations of Ultra's compressors, in terms of latitude and longitude, as well as the linear distance between the compressor stations, and the total area within which the compressor stations would be located, all of which Ultra has agreed to stipulate to for the purposes of the present motion. (Doc. 70, at ¶¶ 3-5; Doc. 71, at 1-2). Consequently, there is no triable issue with respect to the locations of the compressor stations or the distances separating them.

In determining whether the properties at issue are "adjacent", Ultra relies on the dictionary definition of this term and urges this Court to strictly construe this language as only connoting a relationship close in time or space. (Doc. 58). In turn, PennFuture does not dispute the dictionary definition of "adjacent", but instead argues that "[w]hile the concept of adjacency is clearly rooted in physical proximity, it has no built-in ruler [and] necessarily depends on the purposes for which a distance is being measured, and the relationship between the things on either side of that distance." (Doc. 60 at 21).

This Court is now faced with an issue not previously addressed by the Third Circuit or any district courts within it: the meaning and scope of "adjacent" when applied to gas extraction through fracking in Pennsylvania. Thus, we look to such guidance as is presently available.

1. The Sixth Circuit's plain meaning interpretation of "adjacent" in *Summit Petroleum v. E.P.A.*

As the only federal case decided on the Circuit level addressing nearly identical issues to those currently before this Court, the Sixth Circuit's decision in *Summit Petroleum v. E.P.A.* offers a persuasive, though non-binding, interpretation of the EPA's regulations regarding aggregation for purposes of determining whether two or more properties are "contiguous" or "adjacent." *See Summit Petroleum Corp. v. E.P.A.*, 690 F.3d 733 (6th Cir. 2012). In *Summit Petroleum*, Petitioner Summit Petroleum Corporation appealed from a final action by the EPA determining that a natural gas sweetening plant and various sour gas production wells owned by Petitioner and separately located within an area of approximately forty-three square miles constituted a single stationary source under the EPA's Title V permitting program. *Id.* at 735. At issue was the EPA's conclusion that Summit's facilities were located on adjacent properties because, although physically independent, they were "truly interrelated." *Id.* The Sixth Circuit agreed with Petitioner that the EPA's determination that the physical requirement of adjacency can be established through mere functional relatedness was unreasonable and contrary to the plain meaning of the term "adjacent"; therefore vacating the EPA's determination and remanding the case to the EPA to determine whether Summit's sweetening plant and gas wells were "sufficiently physically proximate to be considered 'adjacent' within the ordinary, i.e., physical and geographical, meaning of that requirement." *Id.*

In *Summit Petroleum*, the EPA argued that the term "adjacent" is necessarily ambiguous "because the EPA has never defined a specific physical distance by which it is defined or with which it is simultaneous . . . [and] that '[a]s applied to plant operations that vary enormously across the different industries regulated by the [CAA], [the term "adjacent"] is *at minimum* ambiguous as to whether emissions units that are part of an integrated industrial operation and located 500 feet to roughly eight miles apart may be considered to be located on "adjacent" properties.'" *Summit Petroleum*, 690 F.3d at 741 (emphasis in original). Relying on the dictionary definition, etymological history of the term "adjacent," and applicable case law, the Circuit rejected the EPA's interpretation and found the term "adjacent" to be unambiguous. *Id.* The Court specifically pointed to the lack of any citation by the EPA to authority suggesting that the term "adjacent" "invokes an assessment of the functional relationship between two activities" as well as the Court's own inability to find any such authority, and further determined that the EPA's interpretation of "adjacent" to include a functional relationship test was inconsistent with both the regulatory history of Title V as well as the EPA's own guidance memorandums regarding the application of Title V regulations to the oil and gas industry. *Id.* at 742, 746-749.

### 2. The PADEP October 6, 2012 Memorandum allowing consideration of interdependence.

In late 2012, following the Sixth Circuit's decision in *Summit Petroleum*, PADEP issued final guidance for determining when sources should be considered contiguous or adjacent for the purpose of determining whether aggregation is appropriate. *See* PADEP

Guidance for Performing Single Stationary Source Determinations for Oil and Gas

Industries, Doc. No. 270-0810-006 (Oct. 6, 2012) (hereinafter "PADEP Guidance").  The

Guidance provides that "the plain meaning of the terms 'contiguous' and 'adjacent' should

be the dispositive factor when determining whether stationary sources are located on

contiguous or adjacent properties."  PADEP Guidance, at 6.  However, this statement is

preceded by the statement that "interdependence may be considered when conducting a

single source determination."[16]  *Id.*

Citing the American Heritage Dictionary of the English Language, PADEP Guidance,

mirroring the *Summit Petroleum* decision, defines "adjacent" as "close to; lying near; next to;

adjoining."  *See* PADEP Guidance, at 5; *Summit Petroleum*, 690 F.3d at 742.  Consultation

of other dictionaries yields nearly identical results.  *See, e.g., Oxford English Dictionary*,

*available at* www.oed.com (search "adjacent") (last visited Feb. 18, 2015) ("Next to or very

---

[16] The Court notes that, following the denial of the EPA's petition for rehearing in *Summit Petroleum*, the Director of the EPA's Office of Air Quality Planning and Standards issued a memorandum stating that "the EPA may no longer consider interrelatedness in determining adjacency when making source determination decisions in its title V or NSR permitting decisions in areas under the jurisdiction of the 6th Circuit . . . [but] [o]utside the 6th Circuit, at this time, the EPA does not intend to change its longstanding practice of considering interrelatedness in the EPA permitting actions in other jurisdictions." EPA Memorandum, Applicability of the Summit Decision to EPA Title V and NSR Source Determinations (Dec. 21, 2012), at 1-2 (hereinafter "*Summit* Directive").

In 2014, the U.S. Court of Appeals for the District of Columbia held that the *Summit* Directive violated the agency's regional consistency regulations and vacated the EPA's memorandum. *See Nat'l Envtl. Dev. Ass'n's Clean Air Project v. E.P.A.*, 752 F.3d 999 (D.C. Cir. 2014).  As a result, while the EPA's position may have previously supported Plaintiff's contention that this Court should consider interrelatedness as a factor in our analysis despite the Sixth Circuit's holding in *Summit Petroleum*, this is no longer the case.  The D.C. Circuit's ruling forecloses reliance upon the EPA's *Summit* Directive except to the extent that the EQP and PADEP have promulgated regulations the effect of which is to place more stringent restrictions on the issuance of GP-5 permits by recognizing a broader definition of what may be deemed to be a "major" source of emissions. *See* 40 C.F.R. § 51.165(a)("Deviations . . . will be approved only if the State specifically demonstrates that the submitted definition is more stringent, or at least as stringent, in all respects. . . .").

near something else; neighbouring; bordering, contiguous; adjoining"); *Merriam-Webster*,

*available at* www.merriam-webster.com (search "adjacent") (last visited Feb. 18, 2015) ("Not

distant: nearby"; "having a common endpoint or border").

The PADEP Guidance further states that "only sources that are in close proximity

should be considered contiguous or adjacent properties for single source determination

purposes" and provides several factors that should be considered in determining whether

sources are contiguous or adjacent, specifically:

> (1) properties located within a quarter mile are considered contiguous or adjacent; (2) sources within this quarter-mile distance should be aggregated so long as they meet the other two regulatory criteria (same industrial grouping and common control); (3) emission units on two or more separate, but nearby, properties and separated by an intervening railroad, road, or some other obstacle may be considered contiguous or adjacent; (4) facilities should not be "daisy-chained" together to establish a contiguous grouping; and (5) properties located outside a quarter mile may be considered contiguous or adjacent on a case-by-case basis.

*Id*. at 6-7.  Here, it is undisputed that the properties are not located within a quarter mile,

and that whether the properties are separated by an intervening railroad, road, or other

obstacle is not at issue, thereby negating consideration of the first, second, and third factors

(*see* Unoff. Tr. at 11-12).  The issue thus becomes what factors a Court should consider

when applying PADEP Guidance in conducting a case-by-case analysis when determining

whether properties separated by more than a quarter of a mile are "contiguous or adjacent."

PADEP Guidance recognizes that neither state nor federal regulations define the

terms "contiguous" or "adjacent" nor do the regulations place any definitive restrictions on

the maximum distance permissible wherein two emissions units can still be considered to be located on contiguous or adjacent properties. Other than providing the dictionary definitions of "contiguous" and "adjacent", the Guidance fails to provide any specific direction with respect to determining what constitutes contiguousness or adjacency when conducting a single source determination. However, PADEP Guidance that "the plain meaning of the terms 'contiguous' and 'adjacent' should be the dispositive factor when determining whether stationary sources are located on contiguous or adjacent properties," cautions that any consideration of interdependence in determining whether two or more facilities should be aggregated must be undertaken separately from, but not to the exclusion of, a determination of physical and geographic adjacency.

### C. There is no triable issue of fact when "adjacent" is defined solely with respect to physical and geographic proximity.

As a result of Plaintiff's Supplemental Statement Concerning Disputed Issues of Fact, the geographic distance between the individual stations, as well as the size of the area within which the stations are encompassed, are undisputed. Plaintiff's Statement, to which Ultra has agreed to stipulate, sets forth the precise locations of Ultra's compressors, in terms of latitude and longitude, as well as the linear distances between the compressor stations, and the total area within which the compressor stations are located. (Doc. 70, at ¶¶ 3-5; Doc. 71, at 1-2). Of note, four sets of compressor stations are within one mile of each other (Thomas 808 - Pierson 801; Kjelgaard - Lick Run; Button - Ken Ton; Pierson 810 - Kjelgaard) and the shortest linear distance between any two compressor stations is .78

22

mile (Thomas 808 - Pierson 801).  The Lick Run compressor station and the Button compressor station are the furthest apart at 4.43 miles, followed closely by the 3.96 miles separating the Lick Run compressor station and the Ken-Ton compressor station.

When aggregating Ultra's eight compressor stations, two sets of stations are separated by approximately 4 miles and one set of stations is separated by approximately 3 miles.  Even when considering the emission sources with the highest $NO_x$ emission potential, as Defendant properly states, the Court would have to aggregate at least five of Ultra's compressor stations in order to reach a $NO_x$ emission in excess of 100 TPY (*see* Doc. 62 at 6 n.2): Pierson 810; Thomas 808; Button; Lick Run; and Pierson 801.  This would require the Court to aggregate the Lick Run and Button stations, located 4.43 miles apart, as well as the Thomas and Lick Run stations, located 3.09 miles apart.  Even accepting the parties' stipulation that "if lines were drawn between Ultra's compressors to delineate [the] linear distances [between the compressors], the total area within the lines would be less than five (5) square miles" (Doc. 70, ¶ 5; Doc. 71, at 1-2), this distance fails to establish that the multiple lands necessary to create a "major" source are sufficiently close to, or near enough, each other to be considered adjacent.

Furthermore, the manner in which Plaintiff urges the Court to aggregate Ultra's stations runs afoul of PADEP Guidance that facilities should not be "daisy-chained" together to establish a contiguous grouping.  Given that the regulations prohibit sources from being "daisy-chained" when conducting a case-by-case analysis, it must follow that properties can

also not be "daisy-chained" in order to meet the key requirement of contiguousness or adjacency. Here, the Court would be required to "daisy-chain" a number of properties and their sources in order to find that Ultra's facilities constitute a "major" source.

Because a number of separate and unconnected parcels of land on which the compressors are located would have to be aggregated in order for the $NO_x$ emissions to reach the level of a "major" source, and some of these properties are separated by several miles, the properties at issue cannot reasonably be considered under either *Summit Petroleum* or PADEP Guidance to be "adjacent."

## D. Assuming an interdependent approach is appropriate, Plaintiff has failed to present a triable issue of fact as to Defendant's assertion that the facilities are not interdependent.

PennFuture urges this Court to adopt an "operational and functional interdependent" approach wherein whether the facilities are functionally interdependent is considered one factor in determining adjacency. (Doc. 60). Specifically, Plaintiff contends that "'physical proximity' is not an absolute, self-executing concept; it necessarily turns on factors other than physical distance." (*Id.* at 15). In turn, Ultra argues that the Court should follow the Sixth Circuit's strict approach but contends that, regardless, the individual facilities are not functionally interdependent and therefore the issue of whether proximity should include a consideration of interdependence is moot. (*See generally*, Docs. 58, 62; Unoff. Tr. at 26).

PennFuture admits that no genuine issue of material fact exists such as to prevent the Court from determining whether Ultra's facilities are functionally interrelated. *See*

PennFuture's Supplemental Statement Concerning Disputed Issues of Fact (Doc. 70, ¶ 6) ("[w]ith respect to the functional and operational interrelatedness of Ultra's sources . . ., it is PennFuture's position that the current record contains all of the facts material to a determination by this Court of whether Ultra's compressor stations are functionally and operationally interrelated."). It is undisputed that there is no relationship between the compressor stations, except in the satellite arrangements which do not have the $NO_x$ potential to emit over 100 TPY, and that each compressor station is connected to the metering and regulation station, but not to each other. (Unoff. Tr. at 33; Doc. 55, ¶ 24; Doc. 59, ¶ 24). The compressor stations do not rely on each other, and if one station stops working, this does not prevent the other stations from operating. The parties further agree that the metering and regulation station adjusts the pressure and adjusts and measures the amount of gas that enters the natural gas pipeline. (Doc. 55, ¶ 18; Doc. 59, ¶ 18). While PennFuture disputes that the metering and regulation station does not emit air contaminants due to this station's alleged release of methane (Doc. 59, ¶ 18), it admits that the metering and regulation station does not emit $NO_x$. (Doc. 60, at 16; Unoff. Tr. at 59). As such, at issue is only the application of the undisputed facts to the law.

Despite this Court's finding that the plain meaning of "contiguous" and "adjacent" should control a determination of whether two or more facilities should be aggregated, we decline to hold that functional interrelatedness can never lead to, or contribute to, a finding of contiguousness or adjacency. PADEP Guidance and EHB decisions have both

recognized that interdependence, and whether the sources meet "the common sense notion

of a plant," may be factors in single source aggregation decisions in Pennsylvania.[17]  While

*Summit Petroleum* emphasizes the importance of applying the plain meaning of the term

"adjacent", the Court views the willingness of PADEP to permit consideration on a case-by-

case basis of the interdependence of facilities when determining whether they should be

aggregated as a single source to be a proper exercise of the authority granted to

Pennsylvania under the CAA to adopt "more stringent, or at least as stringent" definitions of

the terms defined by the EPA.  *See* 40 C.F.R. 51.165(a)(1).  Consideration of

interdependence in certain circumstances enlarges the definition of a "facility", requiring that

the NNSR meet a more stringent requirement in order to avoid being found to be a "major"

source, since an inquiry into the interdependence of two or more emitting facilities may

result in the aggregation of more emission sources than would be aggregated if the inquiry

were limited solely to physical or geographic adjacency.  This application also serves to

[17] *See, e.g., Clean Air Council v. Commonwealth of Pennsylvania, Dep't of Environmental Protection*, EHB Docket No. 2011-072-R, at 1-2 ("The Board is not persuaded by the Permittee's argument that functional relationship should never be considered in determining whether two or more pollutant emitting activities are 'adjacent' for purposes of air quality regulation.").

    *See also, e.g., Nat'l Fuel Gas Midstream Corp., et al. v. Commonwealth of Pennsylvania, Dep't of Environmental Protection*, EHB Docket No. 2013-123-B, at 10 (Oct. 31, 2014; corrected Nov. 3, 2014)(Finding on a motion for summary judgment that "there are issues of material fact as to whether a support relationship exists [between the two sources at issue]"); *Nat'l Fuel Gas Midstream Corp., et al. v. Commonwealth of Pennsylvania, Dep't of Environmental Protection*, EHB Docket No. 2013-206-B, at 14 (Nov. 4, 2014)(Denying summary judgment in part based on "a mixed question of fact and law regarding what factors to consider in determining whether sources should be considered a single plant and what significance to give the issue in analyzing whether it satisfies the regulatory requirement").

    We note that in both of the immediately aforementioned EHB cases, the Board denied summary judgment based on numerous disputed issues of fact, finding that the issues should be decided "with the benefit of a full factual record and post-hearing briefs."  Here, the parties have agreed that no factual dispute exists such as to prevent the Court from determining whether Ultra's compressor stations are functionally and operationally interrelated.

promote the CAA's goals of encouraging and assisting States in curtailing air pollution and assuring better air quality.

Here, while no pipelines connect the individual compressor stations (Unoff. Tr. at 33), each of the $NO_x$ emission sources is physically connected to the same metering and regulation station. Therefore, based on each facility's connection to the central metering and regulation station, Plaintiff argues that the operations of all of the compressor stations are integrated and collectively function as a production unit that provides gas to the transmission pipeline through the metering and regulation station, effectively working similarly to a plant wherein the metering station provides the finishing process, and thus must be considered interdependent. (Doc. 60, at 15-16; Unoff. Tr. at 32-34, 40). Specifically, Plaintiff's logic is as follows:

> Ultra's wells and compressor stations are interdependent with its equipment at the metering and regulation station because that equipment performs the final, essential functions of adjusting the pressure and measuring the amount of all gas produced by Ultra's Marshlands wells before the gas enters Dominion's LN-50 pipeline. By way of the metering and regulation station, all of the wells and compressor stations are also interdependent with each other, because all of the gas transported through Ultra's gathering system is ultimately channeled into a single Ultra pipeline at the metering and regulation station. In short, Ultra's wells, its compressor stations and pipelines, and Ultra's equipment at the metering and regulation station function together in the manner of a plant that delivers gas from the Marshlands Play in a condition ready for entry into Dominion's pipelinie [sic].

(Doc. 60, at 15-16).

In support of its argument, Plaintiff makes similar arguments to those put forth by the EPA in *Summit Petroleum* with respect to the definition and scope of the term "adjacent"

and urges this Court to disregard the Sixth Circuit's holding in *Summit Petroleum*. In

particular, Plaintiff relies in part on Judge Moore's dissent in *Summit Petroleum*. (Doc. 60,

at 20-21). Judge Moore's dissent states, *inter alia,* that "functional interrelatedness" is one

factor that can play a role in the determination of whether two objects that are at a given

distance apart are adjacent, and argues that in Petitioner Summit's case, "functional

interrelatedness" had a physical dimension because each stationary source was connected

through a dedicated pipeline. *Summit Petroleum*, 690 F.3d at 752-753. The dissent

contends that the Summit operation was "not only functionally interrelated but physically

interconnected" given that:

> Each source (gas well, flare and sweetening plant) is a stop along a single
> physically connected process; each well is 'next to' and 'immediately
> precedes' the following well, for example. Nothing outside of this process
> either physically or functionally interrupts the traverse of gas from an
> underground field through the gas wells and past the flares to the sweetening
> plant. The properties on which each well or flare are located are likewise
> connected to each other, and to the property on which the plant is located.

*Id.* at 753. PennFuture's reliance on this dissent is unhelpful. Unlike Judge Moore's

description of the location of Summit's sweetening plant and gas wells, in the present case,

the emission stations do not follow each other, the pipelines are not connected through a

single process, and no pipeline connects each of the individual compressors to one another.

PennFuture's argument is thus not sustainable. It is undisputed that the gas from

each compressor station flows in only one direction to the same metering and regulation

station. These compressor stations are not connected in any other way, and operate

independently of one another. Other than their physical location, there is no discernable relationship between the individual emission stations. While PADEP Guidance and EHB decisions have both recognized that interdependence may be a factor in conducting a single source determination, they also make clear that the plain meaning, as found in the dictionary, of the terms "contiguous" and "adjacent", and not the interdependence between the sources, should be the dispositive factor in determining whether stationary sources are located on contiguous or adjacent properties. As such, to look beyond the plain meaning of the terms "contiguous" and "adjacent" when conducting a case-by-case determination, the case should present a unique factual scenario. Plaintiff has not pointed to any record facts to demonstrate that Ultra's individual facilities are in any way unusual or outside of the normal oil and gas configurations and arrangements contemplated by PADEP.

Nonetheless, the Court recognizes the risk that a strict application of the plain meaning of the terms "adjacent" and "contiguous" may allow oil and gas exploration and production companies to manipulate or structure their wells and compressors in such a technical way as to avoid being deemed a "major" source, including by avoiding the aggregation of their wells and compressors. As a result, we depart from the Sixth Circuit's interpretation of "adjacent" to the extent that it prohibits any consideration of interrelatedness or interdependence, and we emphasize the importance of the PADEP Guidance recommending that a "case-by-case determination is needed to determine if sources are considered contiguous or adjacent." We agree with the majority in *Summit*

*Petroleum* that the plain meaning of "contiguous" and "adjacent", when applied, should normally operate to allow a determination as to whether stationary sources should be aggregated. However, we recognize that to strictly limit that determination so as to never consider functional interrelatedness would run afoul of PADEP's Guidance and could very likely lead to the anomalous situation wherein emitting sources which are clearly functionally related are able to avoid the more stringent standards applicable to "major" sources under the CAA and state law because of a wooden and inflexible definition of adjacency. Nevertheless, solely because independently functioning compressors ultimately deposit gas from the individual wells each separately services into a common pipeline for transmission in the market does not establish functional interrelatedness. Thus, in the instant action, PennFuture has presented no material facts to dispute Ultra's contention that the properties are not physically proximate and that the emission sources are not interrelated.

### E. Public policy considerations.

Ultra's final arguments that Plaintiff should not be allowed to come to federal court and challenge the construction permits issued by PADEP after the company has relied on the permits and expended significant resources building the facilities at issue, and that Plaintiff is thereby asking the Court to conduct an *ad hoc* hearing to determine the scope of functional interdependence and its weight in relation to proximity and adjacency (Doc. 58, at 19-23; Unoff. Tr. at 43-50) has no real place in this summary judgment determination. The Court takes note of PennFuture's failure to act prior to its filing of the present action, despite

30

having actual and/or constructive notice of each GP-5 permit approvals issued to Ultra by PADEP, as well as Plaintiff's decision not to appeal any of these GP-5 permit approvals to the EHB.[18] However, this issue is irrelevant in light of our prior ruling on Defendant's motion to dismiss, finding that the CAA gives a party the right to bring an action such as this one directly to federal court.

## V. CONCLUSION

For the foregoing reasons, the Court will grant Defendant Ultra Resources, Inc.'s Motion for Summary Judgment (Doc. 55). A separate Order follows.

Robert D. Mariani
United States District Judge

---

[18] In oral argument, counsel for PennFuture stated that Ultra has placed in dispute PennFuture's reasons for filing this case in federal court and not to file any appeals to the EHB. (Unoff. Tr. at 55-56). PennFuture's motives are ultimately irrelevant here and we disagree that such a factual dispute is material to the resolution of this case.